857 So.2d 432 (2003)
In re Judge C. Hunter KING.
No. 2003-O-1412.
Supreme Court of Louisiana.
October 21, 2003.
Order Suspending Exercise of Judicial Functions October 22, 2003.
*433 Nancy E. Rix, Commission Legal Counsel, Hugh M. Collins, PhD., Chief Executive Officer, Steven R. Scheckman, Special Counsel, Mary F. Whitney, Assistant Special Counsel, Tartiana J. Lopez, Counsel for Applicant.
Scott R. Bickford, John R. Martzell, Martzell Bickford, New Orleans; Regina O. Matthews, Louis L. Robein, Jr., Robein, Urann & Lurye, Metairie, Counsel for Respondent.

ON RECOMMENDATION FOR DISCIPLINE FROM THE JUDICIARY COMMISSION OF LOUISIANA
VICTORY, J.
This judicial disciplinary proceeding comes before the Court on the recommendation of the Judiciary Commission of Louisiana (the "Commission") that Judge C. Hunter King of the Orleans Parish Civil District Court, Division "M," State of Louisiana, be suspended from office for a period of one year without pay and ordered to reimburse the Commission the costs incurred in the investigation and prosecution of the case. The Office of Special Counsel (the "OSC") conducted an investigation, and then filed two formal charges against Judge King, Charge 0188, which accused him of campaign misconduct, and Charge 0189, which accused him of lying about his campaign misconduct to the Commission. Judge King and the OSC thereafter submitted a Statement of Stipulated Uncontested Material Facts and Stipulated Conclusions of Law (the "Stipulation") to the Judiciary Commission on December 17, 2002.[1]
The Commission adopted the Stipulation and made additional findings of fact and conclusions of law, and determined that respondent violated Canons 1, 2 A, 2 B, 3 B(2), 7 B(1)(b) and (c) and 7 D(1) of the Code of Judicial Conduct and La. Const. art. V, § 25(C).[2] The Commission then recommended to the Court that it suspend Judge King for one year without pay and order him to reimburse the Commission's costs.
*434 On June 5, 2003, the Commission and Judge King filed a "Joint Waiver of Oral Argument and Briefing and Consent to One-Year Suspension Without Salary." Judge King filed an unopposed motion to have his suspension commence on September 1, 2003. This Court denied both motions on June 19, 2003, and set the case for oral argument for the purpose of determining the appropriate discipline for Judge King's admitted misconduct.

FACTS AND PROCEDURAL HISTORY
On October 4, 2001, the OSC received a complaint against Judge King from his former court reporter, Barbara Wallace. Among other things, Ms. Wallace alleged that Judge King terminated her employment because she refused to sell tickets to a campaign fund-raising event on behalf of Judge King. She further alleged that the reasons given for her termination in her termination letter were false and that she had proof to support her allegations. On November 6, 2001, OSC notified Judge King of the complaint and asked him to respond to the following issues raised by Ms. Wallace: whether he terminated Ms. Wallace because she refused to sell a requisite number of fund raiser tickets and to deliver a personal package; and whether he abused the court's resources and his administrative authority.
Judge King responded through his attorney in a letter dated November 20, 2001, denying that he required Ms. Wallace or any of his court staff to engage in impermissible campaign activity, and stating that Ms. Wallace was not fired, but resigned. The ten-page response on behalf of Judge King contained the following statements:
a. "[T]he above-referenced complaint is unfounded and represents nothing more than an unprincipled, retaliatory attack on a respected Judge by a disgruntled former employee."
b. "Wallace's employment in Division `M' was at no time conditioned on her participation in fund raising activities. Wallace's unspecified allegation in this regard is false."
c. "Neither the Judge nor any member of the fund raising committee instructed Wallace to sell `20 tickets,' much less a single ticket."
d. "Judge King specifically recalls informing his staff in a Monday staff meeting that the fund raising had begun, that no court personnel could `push' tickets during working hours or on Court premises."
e. "[H]e took great pains to remind his staff that only the private fund raisers could perform that function."
f. "He did advise in September 2001, as he had done last year, that his staff could assist in fund raising on their own time and only through the auspices of the committee."
g. "[N]o employee `sold' tickets."
h. "Only Minute Clerk Brossett worked on committee functions, and at that, after work hours."
Attached to the letter were Judge King's letter to Ms. Wallace informing her that her "services as court reporter for Division `M'" would no longer be needed as of October 3, 2001,[3] and Ms. Wallace's letter *435 to Judge King in response, claiming that she did not resign, but was fired.[4]
After Judge King responded to the complaint, on December 6, 2001, Ms. Wallace sent the OSC copies of the transcripts of four staff meetings in which Judge King discussed his employees' obligations to engage in fund raising activities and copies of the audio tapes from which the transcripts had been made (all made without Judge King's knowledge). The tapes and transcripts revealed the following impermissible campaign activity, all of which Judge King later admitted in the Stipulation.
In these staff meetings, held in September and October of 2001, Judge King told the members of his court staff that each of them was responsible for selling twenty tickets to a fund raising event scheduled to take place on October 25, 2001. In a staff meeting of September 10, 2001, Judge King made the following statements:
Kelly [the minute clerk], you and I need to identify those that we've already, I think, for the most part identified that's going to be given lots of anything over 10 ticketsSo everybody got all their people identified to sell their 20 tickets.
BARBARA: We get 20?
KELLY: Last week it was 10.
JUDGE KING: Yeah, but I thought when we sat down initially and we worked that out, me, you and Stan, we came up with the number 20. We didn't come up with the number 20, Stan?
...
I certainly hope everybody gets 20 `cause with the notion of 20, then regardless of what other people other people are going to sell, it won't even, you knowten don't even scratch the surface from this office, that ain't nothing but 2500. That don't even scratch the surface. Twenty is 5,000 per individual. And that ain't nothing but 30. But whatever, if anybody is going to have a problem, they need to talk up before the last minute becauseso they can get some help.
BARBARA: I know I'm going to have a problem.
JUDGE KING: Why?
BARBARA: I mean, I just don't know that many people to do that. I'm going to do the best that I can do, but I think I'm going to have a problem. I might need help.
Judge King also told the members of his court staff that each of them was required to make a personal contribution to his campaign fund if he or she failed to sell the requisite number of tickets. In the staff meeting of September 10, 2001, Judge King made the following statement:
Does everybody have invitations with them to have in their possession, so as you meet people out and away from this court, you'll be able to sell them? If you don't, you need to get some. `Cause in *436 addition to whatever contribution or whatever you make individual, we need to get some tickets to make sure that we get them allthis is the 10th, by the 9th, we want to have 300 invitations sold. So that's four weeks. So that's 3 and a half weeks, a hundred invitations per week.
In the staff meeting of September 13, 2001, Judge King told his staff: "I want to be clear. I want everybody to meet their 20, so they ain't got to come up with no money."
Further, Judge King personally sold tickets to the fund-raising event. In the staff meeting of September 10, 2001, Judge King told his staff, "I want to send those three, Willie Garrett himself, Michael Lewis, and Finney. And before we put it in the mail, I want to write a little sticky note that says, basically, I appreciate your contribution to help me eliminate the debt of my campaign." In the staff meeting of September 13, 2001, Judge King made the following statements:
I don'tlook, let me tell you omething [sic], ain't nobody in here going to sell more tickets than me.
...
Why wouldn't I get five people to participate when I'm walking them all the time? I'm walking invitations more than anybody.
...
How do you think I get rid of mine, I walk them.
Judge King even sold fund raiser tickets at a funeral, as shown by his comment at the September 13, 2001 meeting:
You saw what we did just the other day when we went to a funeral.... Now, a funeral clearly ain't no place where you hustle no damn tickets, but we did it tactful and I don't think it was unappropriate [sic] because we may not see that guy, Billy, whatever his name was.... We may not see him again between now and our fund raiser. But the fact that we saw him, we know one thing, we need to get a number and we need to make sure I at least approach him and say, look, I appreciate you showing up.
Judge King instructed his staff to hand-deliver[5] the tickets to lawyers and law firms in the downtown metropolitan area[6] *437 during the day on court time and he informed the staff that their activities in support of his campaign for re-election were a priority, taking precedence over their regular court duties.[7] In the staff meeting of September 13, 2001, the following exchange took place:
KELLY: No, let me just say. We've got work coming out the yang, yang. We've got lawyers coming in here, the phones ringing off the hook, everybody needs something. At the same time, you give us things to do and you want it don't [sic] (clap, clap) like that. So we make you a priority and we push our work on the back burner to make sure that we accommodate you. Then at the same time we have to be conscious of push the fund raiser, push the fund raiser, `cause the fund raiser is a priority. But yet the things you have, the extras you have and the phone calls and everything is a priority and our work at some point has to be taken care of.
JUDGE: No doubt. So you're saying as a result of some of the other competing things that come in the door and the other things that are also being pressed to be done, there's not enough time in the day to get everything done.
Judge King also stated the following at the September 13 staff meeting:
So for the week of the 1st of October, that should be a week of doing what, collecting money, collecting money. Going back to those law firms. I mean, you ain't going to have no court here. Going back to those law firms and picking up checks.
In addition, Judge King had a lengthy discussion with Ms. Wallace at the September 24 staff meeting concerning the impact her campaign duties were having on her ability to prepare transcripts, as follows:
JUDGE: ... Know that we got to get some things done starting today since all we're going to do today is campaign stuff, other than those two things or three things on the docket at 2:00. At 2:30 I have that case coming back in, so at least, wherever you go, Barbara, at 2:30 I need you back at the courthouse so that we can go on the record and put my ruling in this case from yesterday.
...
I thoroughly understand. So you call and you tell them the Judge is in court, I haven't had an opportunity to do it. Now, what you do after hours, I don't know, but in terms of if we got court on Wednesday, then obviously you can't do it. It's just that simple. And whenever we don't have court or when you go home, then you get it done then or you get it done after we break from court. But today, we're doing this. Friday, we're doing this again, period.
During that same staff meeting, the following exchange took place:
MS. WALLACE: So, Judge, what do you want me to do about my stuff?
*438 JUDGE: Right now, nothing is going to get done today other than campaigning.
MS. WALLACE: I mean, you said the whole week in October, too. I mean, I've got two trial appeals due at the end of October. And I have one transcript that they wanted for tomorrow. I'm going to just call and tell them I can't do it, but when they tell you that they didn't get a transcript, I don't want you jumping on me.
JUDGE: Barbara, you wouldn't have finished the transcript today anyway, right?
MS. WALLACE: I would have finished the one for tomorrow if I could have worked on it, yeah. It's not that long.
JUDGE: All day?
MS. WALLACE: All day.
JUDGE: Well, they're going to have to wait `cause we're doing this. All you need to do is tell them you don't have it, they'll get in [sic] the next day. All you need to dothat's all you need to tell them. They wanted it for tomorrow, right?
MS. WALLACE: For tomorrow morning.
JUDGE: So, tomorrow is Wednesday. You can work on it Wednesday; you can give it to them Thursday. Friday, we're going to be back on the campaign deal. It's as simple as that.
When the staff balked at raising money for Judge King's campaign, he told them at the September 13 and 24 staff meetings, that if they were unwilling to do what he asked, he would find people to replace them who were more "enthusiastic":
Ain't too many people around here going to do more than what [campaign committee member] Ed Shanklin's going to do and he don't even work here. Therein liesI got somewhat of a problem here. I got five10 people that don't work for me, don't get no direct benefit, especially from income, doing more than the five peopleor maybe not the five people, but more than some of the people that are actually in my employment. Something is wrong with that picture. I don't feel like I need to coordinate the effort today because we're working as a team. So the last thing I want to hear from anybody is what one person is doing more than the next person or I'm notI'm going to tell you right now, they got people sitting in the wings this morning, who work in this courthouse. If I can't [sic] cooperation from my five primary people that benefits in the courthouse, then I guess I might have to replace them and see just how enthusiastic these other people are.
After reviewing the tapes containing the above statements, the Commission authorized an investigation into the allegations, and the Commission's Counsel sent Judge King a letter dated February 20, 2002, advising him, among other things, as follows:
Ms. Wallace alleged, among other things, that she was terminated from employment on your staff after she refused (or was unable) to sell twenty tickets to a campaign fund-raiser being conducted on your behalf ... If Ms. Wallace's allegations are proven to be true, if [sic] may be that you have violated the Code of Judicial Conduct, including Canons 1, 2 A, 2 B, 3 B(2), and 7 B(1)(b) and (c), and 7 D(1).
Thereafter, on April 2, 2002, when Assistant Special Counsel Mary Whitney took Judge King's sworn statement in the presence of his counsel, Judge King gave false and misleading testimony concerning issues which were pertinent and material to the investigation of Ms. Wallace's complaint. For example, the following questions were asked of Judge King during *439 his April 2, 2002, sworn statement (Judge King's responses, given under oath, are reproduced beneath the question):
Q. Have you ever distributed tickets to any fund-raising event to any member of your staff for him or her to sell?
A. Absolutely not.
Q. Did you ever tell any member of your staff that they were responsible for selling fund-raising tickets?
A. No.... They had no direct responsibility to do anything in terms of selling tickets.
Q. Did you ever, during a staff meeting discuss with your staff what you expected them to do for your campaign?
A. No, I've never in a staff meeting talked about what I expect any of my staff persons to do in terms of their participation.
Q. To your knowledge did [Division "M" Minute Clerk] Ms. Brossett perform any duties in connection with your campaign at the time when she was at court, on the clock, so to speak?
A. Absolutely not. I've, on more than one occasion impressed upon all of my staff members that they cannot engage in any type of campaign activity while at work and while doing the public's work.
Q. With regard now to any of your staff members, are you aware of any of them using court time to perform any duties in connection with your campaign?
A. Absolutely not. If they did something during the day then they either took personal time which they have, a lot of personal time, vacation time, orbut absolutely not, not while on the clock.
Q. Did you ever require any member of your staff to participate in your campaign?
A. No. Everything in terms of my Division beyond the court activity is strictly voluntary.
Q. Do you ever discuss what you expected your staff members to contribute in the way of money toward your reelection campaign or toward your campaign?
A. Absolutely not. In my view they don't make very much monies [sic] to contribute to campaigns.
Q. Did you ever direct any member of your staff to hand deliver tickets to any fund-raising event to anyone who either had bought a ticket or who might buy a ticket?
A. No.
Q. Did you ever direct any member of your staff to personally pick up money from someone else who had either bought a ticketwho had bought a ticket to a fund-raising event?
A. Absolutely not. When people call the office and say, "Look, I want to come to the fund raiser," they are directed to Ed Shanklin.
Q. Did you ever give anybodyreduce anybody's duties, court duties so that they would have more time to participate in any campaign activities for you?
A. Absolutely not.
Q. Do you allow staff members to postpone their regular duties in order to do work for your campaign?
A. Absolutely not. If Rule day is on Friday, regardless of what it is that we're in the process of doing, whether or not I have to make a speech outside the office, whether or not one of my law clerks are accompanying me to that speech, or going to make the speech on my behalf, on Wednesday and Thursday it is expected that they have the necessary memos done. So regardless of what is it we're doing in the community, Civil District Court *440 business is to be done primary, all the time.
Q. Did you ever tell any member of your staff that if he or she wasn't willing to work or help with your campaign that you would find others to work for you who would be willing?
A. No. That statement went like this: there was a staff meeting that I probably was a little bit heated, ... And, it was a day in which it was not a very good day in terms of the court activity in which I probably said on more than one occasion, that I can find five people out on the street to do these five jobs. If you're not willing, and you're not willing to do what's needed to be done to make Civil District Court Division "M" run effectively to where it serves the public, I could find five other individuals that are willing.
Q. Did you alter your typical court schedule during September or October of 2001 when you were preparing for the fund-raising event?
A. Absolutely not. Trials that were scheduled, if it didn't settle, they went. If they settled then we did other things to prepare for the next day or the next case that was coming forward.
Q. Did you alter the typical duties of any of your staff members during September or October of 2001 in preparation for the fund-raising event?
A. I never alter anybody's duties in terms of their responsibilities. I think I've made it known to all of my staff that we first are responsible for the Division because we work for the public.
Q. Did you ever shut down your Division of court in order to devote your time to your campaign?
A. Absolutely not. That would have meant to declare the Division having a holiday when there was no holiday which meant we would not have been in business to serve the public on that given day.
Q. Did you ever shut down your Division of court in order to have your staff devote their time to your campaign?
A. Absolutely not.
Q. Did you ever direct any member of your staff to ask anyone to purchase a ticket to any fund-raising event? ... Some other third party to purchase a ticket to a fund-raising event?
A. Absolutely not.
Finally, Judge King denied that he personally engaged in any fund-raising: "... I wasn't giving anybody any tickets comp or pay or otherwise."
On October 22, 2002, the Judiciary Commission ("Commission") filed two sets of formal charges against Judge King, alleging that Judge King engaged in impermissible campaign misconduct and allowed and required his staff to do the same, and that Judge King authorized statements in the letter of response to the Commission dated November 20, 2001 and made statements during his sworn statement of April 2, 2002 which he knew to be false and which were pertinent and material to the issues under investigation.[8] The day after *441 the charges were served upon Judge King's counsel, the OSC provided copies of the audio tapes and transcripts of Judge King's staff meetings to Judge King's counsel.
On December 17, 2002, Judge King and the OSC jointly filed a "Statement of Stipulated Uncontested Material Facts and Stipulated Conclusions of Law."[9] In the stipulated facts, Judge King admitted making the statements attributed to him in the transcripts of the staff meetings provided by Ms. Wallace, admitted making the statements attributed to him in the transcript of his sworn statement, and admitted that those statements which he made in his sworn statement which are quoted in the Stipulation were false. Judge King also admitted in the stipulated facts that he made statements in his response to Ms. Wallace's complaint and during his April 2, 2002, sworn statement which he knew or should have known were false or misleading and which were pertinent and material to the issues under investigation by the Commission. Based on these stipulated facts, Judge King and the OSC agreed in the Stipulation that he violated the Code of Judicial Conduct as charged in the formal charges, engaged in willful misconduct relating to his official duty, and engaged in persistent and public conduct prejudicial to the administration of justice that brought the judicial office into disrepute, in violation of La. Const. art. V, § 25(C).[10]
The Commission voted to accept the stipulations of fact and accepted in part the legal conclusions submitted by the parties. At his request, Judge King appeared before the Commission on March 14, 2003. During the hearing, Judge King testified *442 on his own behalf, responded to questions posed by the Commission members, and called two character witnesses to testify in person before the Commission. Judge King also introduced character evidence in the form of affidavits submitted by judges and attorneys, and in the form of articles entitled "Pillar of the Community: Judge C. Hunter King," published in the Newsletter of the Judiciary of the State of Louisiana, Vol. 4, No. 2 (Spring 2001), and "Justiciability: A Personal Journey with C. Hunter King," published in the New Orleans Tribune, Vol. 15, No. 10 (October 1999). In light of this evidence, the Commission accepted that Judge King is regarded in the community as a person of good character.
Judge King told the Commission that he involved his court staff in his efforts to raise campaign funds because he was not part of the "political establishment in the city," and he felt pressured to eliminate campaign debt from the race he ran in 1999. Judge King agreed that he "made some improper demands on my staff and myself to try to raise money to eliminate that debt because I didn't want individuals holding me hostage when they came in my court." When asked why he lied in his sworn statement concerning his conduct, Judge King said:
Well, I should have known that it was wrong. And sometimes, unfortunately, fear has a tendency to cloud one's judgment. And clearly in this instance, fear and being a part of this very intimidating process did that ... I just panicked. I'd never been, I guess, on this side of the equation. [emphasis added]
Judge King further explained that when he appeared for his sworn statement, he assumed he would only have to respond to questions concerning Ms. Wallace's employment, specifically whether she resigned or was fired. Given this assumption, Judge King testified he did not think he committed perjury when he lied in response to the other questions asked by Assistant Special Counsel Mary Whitney.
In recommending discipline, the Commission looked to the factors set forth by this court in In re: Chaisson, 549 So.2d 259 (La.1989),[11] and concluded as follows:
(A) and (B) Judge King acted impermissibly in his handling of Ms. Wallace's refusal to participate in his political fund raising. He violated the Code of Judicial Conduct by personally fund raising, and by using his staff to do so on his behalf, including during the times the staff should have been working on court business.
(C) and (D) Judge King's actions did not occur as part of his duties on the bench, but he used the resources of his job that were intended for the benefit of the public, in *443 particular the use of his court staff, for his personal benefit.
(E) Judge King admitted that the acts described in the formal charges occurred, but not until he was informed that his misconduct could be reviewed by listening to an audiotape.
(F) Because the circumstances that led to the ethical misconduct surrounded fund raising to satisfy judicial campaign debt, they are not expected to reoccur frequently. Judge King told the Commission he presently has campaign debt, but the members of the Commission believe he will follow the applicable rules and procedures, as he described to them on March 14, 2003, in trying to collect funds to satisfy that debt. More problematic is Judge King's lying while under oath to the Commission and his misuse of public resources. The Commission cannot know whether these kinds of acts will occur in the future if Judge King's conduct is not under scrutiny.
(G) Judge King was a new judge when the ethical misconduct alleged in the formal charges occurred.
(H) There have been no prior complaints to the Commission concerning Judge King that have resulted in the filing of formal charges or other sanctions.
(I) Judge King's violation of the Code of Judicial Conduct has undermined the judicial process in the New Orleans area in several ways. First, many, if not all, of the lawyers who were approached so aggressively by the judge or his staff undoubtedly felt unfairly pressured to buy fund raiser tickets. Second, his staff was put under tremendous pressure to "work lawyers" to sell tickets, with the threat of having to personally pay for unsold tickets, or in some cases, losing their jobs. The fact of these events becoming public, together with the publicity that can be expected to ensue about the judge's failure to be truthful when questioned under oath, can only further undermine the judicial process.
(J) The stipulations reflect that Judge King effectively used his position for significant personal advantage. Judge King lied to the Commission staff while under oath, exhibiting his bad faith, and the Commission deemed such lying as the most serious conduct supporting the recommendation to the court.
The Commission recognized that as a constitutional fact-finding body, it is not a court, and is not called upon or empowered by law to render legal judgments, including whether the crimes of perjury and public salary extortion were committed by Judge King. With such caveat in mind, the Commission stated:
[A] majority of the Commission finds that the record overwhelmingly shows that Judge C. Hunter King's actions as stipulated by him and the Office of Special Counsel were in violation of the Code of Judicial Conduct and the Louisiana Constitution, specifically, Article V, Sec. 25C thereof. In deciding upon a recommendation of discipline to submit to the Louisiana Supreme Court, the Commission considered that Judge C. Hunter King was engaged in an effort to aggressively appeal to lawyers who appeared before him in his court to buy fund raiser tickets to reduce his prior campaign debt, and he essentially coerced his staff to assist him in that effort, in more than one case to the exclusion of their court duties. Notably, *444 this time staff took away from their court duties was over a four-week period, at a minimum, even though it was not established that all the staff did no court work over that lengthy time. It was clear that the work time used for Judge King's fund raising was detrimental to the functioning of his court. Further, the stipulated facts made it clear that Judge King personally sold fund raiser tickets, in violation of the Code, in one instance at a funeral. Judge King lied in his initial letter response to the Commission staff when he was first queried about Mrs. Barbara Wallace's complaint, he lied when his personal statement was taken, and he failed to correct any of these prior false statements, telling the truth only when he learned that his conversations with Ms. Wallace and others on his staff had been audio taped. Even accepting as true Judge King's contention that he lied to the Commission staff about Ms. Wallace's complaint because he panicked when he was asked questions other than whether he fired Ms. Wallace or she quit, it is clear from the record that Ms. Wallace's actual complaint cited to three different sections of Canon 7 of the Code of Judicial Conduct and the notice of investigation letter, in addition to citing numerous Codal provisions, informed the judge that Ms. Wallace alleged that she was forced to sell tickets to a fund raiser for Judge King. He unquestionably lied in multiple instances about these facts alone, about which he could not have been surprised. Judge King told the Commission members at the March 14, 2003 proceeding that he engaged in the conduct alleged in the Formal Charges because he felt pressure to reduce prior campaign debt because he didn't want persons to whom he owed money going into his court and holding him "hostage." To the Commission, the coercive efforts Judge King used, and urged his staff to use, to sell fund raiser tickets to lawyers, as reflected in the stipulation of facts, would likely cause such purchasers to believe Judge King would look favorably on cases they tried in his court, and those individuals who did not contribute by buying tickets could expect to suffer therefor. The Commission could not distinguish how Judge King thought his position would be improved by paying off prior debt with monies generated by the ticket selling campaign he waged and forced his staff to wage.
Based on these considerations, the Commission recommended that Judge King be suspended from judicial office for one year,[12] as well as ordered to reimburse and pay to the Commission costs in the amount of $693.50 incurred in the investigation and prosecution of this case.[13]

DISCUSSION
This Court is vested with exclusive original jurisdiction in judicial disciplinary *445 proceedings by La. Const. art. V, § 25(C). Therefore, this court has the power to make determinations of fact based on the evidence in the record and is not bound by, nor required to give any weight to, the findings and recommendations of the Judiciary Commission. In re Wimbish, 98-2882 (La.4/13/99), 733 So.2d 1183, 1186; In re Quirk, 97-1143 (La.12/12/97), 705 So.2d 172.
The grounds for disciplinary action against a judge are set forth in La. Const. art. V, § 25(C), which provides, in pertinent part:
On recommendation of the judiciary commission, the supreme court may censure, suspend with or without salary, remove from office, or retire involuntarily a judge for willful misconduct relating to his official duty, willful and persistent failure to perform his duty, persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute, conduct while in office which would constitute a felony, or conviction of a felony.
In addition to these substantive grounds for disciplinary action, this court, in accordance with its supervisory authority over all lower courts, has adopted the Code of Judicial Conduct, effective January 1, 1976, and amended July 8, 1996. The Code of Judicial Conduct is binding on all judges, and violations of the Canons contained therein may, without more, serve as a basis for the disciplinary action provided for by La. Const. art. V, § 25(C). In re Hunter, 02-1975 (La.8/19/02), 823 So.2d 325; In re Jefferson, 99-1313 (La.1/19/00), 753 So.2d 181; In re Bowers, 98-1735 (La.12/1/98), 721 So.2d 875. The charge or charges against a judge must be proved by clear and convincing evidence before this Court can impose discipline. In re Hunter, 823 So.2d at 328; In re Bowers, 721 So.2d at 880; In re Johnson, 96-1866 (La. 11/25/96), 683 So.2d 1196; In re Huckaby, 95-0041 (La.5/22/95), 656 So.2d 292.
As stated above, after being confronted with the tapes, on December 17, 2002, Judge King, his counsel, and the OSC entered into a Statement of Stipulated Uncontested Material Facts and Stipulated Conclusions of Law. Therein, Judge King admitted that the stipulated facts establish violations of the applicable constitutional provision and of the Canons set forth in the Code of Judicial Conduct. Under these circumstances, this Court's responsibility is limited to determining the sanction to impose for the violations. In re Johnson, supra, 683 So.2d at 1299; In re Decuir, 95-0056 (La.5/22/95), 654 So.2d 687, 692 (parties stipulated relevant facts and judge admitted facts established violations of Code of Judicial Conduct; Court "left only with the task of deciding the appropriate measure of discipline in this case.")
We rejected the Commission and Judge King's joint consent to a one-year suspension without pay and set the case for oral argument in order to determine if Judge King's conduct warranted more serious punishment than that, and particularly, whether removal from office was appropriate. In In re Hunter, we expressed the serious considerations involved in determining whether to remove a judge, as follows:
Removal of a judge from duly-elected office is undoubtedly the most severe sanction this court may impose under the authority granted to us by the constitution. Not only is the judge removed from his or her present judicial office, but removal also precludes the former judge from becoming a candidate for judicial office for a minimum of five years and until his or her eligibility to seek judicial office is certified by this court. See La. Sup.Ct. Rule XXIII, *446 § 26. Consequently, we recognize that removal of a duly-elected member of the judiciary is "an extremely serious undertaking that should be carried out with the utmost care" because it disrupts the public's choice for service in the judiciary.
On the other hand, the constitution "vests in this court the duty to preserve the integrity of the bench for the benefit of the public `by ensuring that all who don the black robe and serve as ministers of justice do not engage in public conduct which brings the judicial office in disrepute.'" To that end, we have recognized that the primary purpose of the Code of Judicial Conduct is "to protect the public rather than to discipline judges." Likewise, the objective of a judicial disciplinary proceeding "is not simply to punish an individual judge but to purge the judiciary of any taint."
823 So.2d at 333 (cites omitted). As Justice Knoll stated in her concurrence in the Hunter case, since 1887, we have removed only seven judges from offices (now eight including Hunter). Thus, removal of a judge is a task we take cautiously and only when justice demands it.
Although the Chaisson factors are used in considering the appropriate sanction in non-removal cases[14] and were considered by the Commission in this case, in cases wherein the judge was removed from office, we have cited the guidelines noted in In re Whitaker, 463 So.2d at 1303, itself a non-removal case. See e.g., In re Hunter, supra; In re Johnson, supra. The Whitaker court stated:
[t]he most severe discipline should be reserved for judges who use their office improperly for personal gain; judges who are consistently abusive and insensitive to parties, witnesses, jurors and attorneys; judges who because of laziness or indifference fail to perform their judicial duties to the best of their ability; and judges who engage in felonious criminal conduct.
Whitaker, 463 So.2d at 1303. In addition, the four types of conduct recognized in Whitaker as warranting removal "were not intended as an exclusive list of the types of conduct for which a judge can be removed from office." In re Hunter, supra at 335 (citing In re Huckaby, supra at 296-297). In Huckaby, we explained that "both La. Const art. V, § 25 and the Code of Judicial Conduct contemplate, and allow, removal for a broader range of offenses than the illustrative list set forth in Whitaker." In re Huckaby, supra at 296-297. Indeed, especially relevant to this case, La. Const. art. V, § 25 authorizes removal from office for, among other things, "willful misconduct relating to [the judge's] official duty," "persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute," both of which Judge King has stipulated, and "conduct while in office which would constitute a felony."
In this case, we have no trouble finding that by his admitted violations of the Code of Judicial Conduct involving his campaign misconduct, Judge King committed" willful misconduct relating to his official duty" and that he "use[d][his] office improperly for personal gain." Judge King has stipulated that he violated Canon 7 D(1) by "personally accepting campaign contributions;" that he violated Canon 7 B(1)(b) and (c) by failing to "prohibit [his] employees and officials who serve at the pleasure of the candidate, and [to] discourage other employees and officials subject to the candidate's direction and control from doing on the candidate's behalf what the candidate is prohibited from doing *447 under this Canon," and by "authorizing[ing]... any person to do for the candidate what the candidate is prohibited from doing under this Canon." Indeed, Judge King required his staff to do on his behalf what he was prohibited from doing under Canon 7.[15] Further, he admittedly *448 violated Canons 1, 2 A, 2 B, and 3 B(2) by the above misconduct and by requiring his judicial staff to work in his campaign during working hours at court expense, to the detriment of the work his court should have been doing.
Further, Judge King required his employees to participate in fund-raising activities on court time to the detriment of their regular court duties, expected them to participate as a condition of their continued employment in his division of court, and made clear to them that he expected them to contribute their own money to his campaign if they failed to sell the requisite number of tickets to his fund raiser. This admitted conduct also falls within the definition of the felony of public salary extortion even if no member of his court staff actually contributed money because the statute includes attempts to solicit or receive as well as the receipt, and, it is undisputed that his court staff did use court time to engage in campaign-related work.[16] We make this finding not for the purpose of opining that Judge King, should, could or would be prosecuted and convicted of public salary extortion, but only for the purpose of finding that his conduct meets the criteria for removal, e.g. "conduct while in office which would constitute a felony." La. Const. art. V, § 25(C). We reject respondent's argument that a "conviction" is necessary for a judge's possible criminal conduct to fall under the category of behavior for which removal is appropriate, for La. Const. art. V, § 25(C) clearly lists "conduct while in office which would constitute a felony," as a grounds for discipline. In addition, in Whitaker, where we included "felonious criminal conduct" in the illustrative list of behavior that called for removal, we relied on evidence that Judge Whitaker had committed a misdemeanor offense by smoking marijuana on two occasions, even though he was never charged or convicted, as a grounds for discipline against him.[17] In sanctioning this misconduct, we stated:
One who holds a judicial office must adhere to the highest standards of personal conduct. A criminal act for which any citizen may be punished by imprisonment is much more serious when the conduct is that of a judge. Such conduct is clearly prejudicial to the administration of justice and brings the judicial office into disrepute.
In re Whitaker, supra at 1303. Even without this finding of conduct that would constitute a felony, Judge King's actions *449 clearly fall within "willful misconduct relating to his official duties." In re Whitaker, supra.
However, as the Commission found and we agree, even more reprehensible, is his misconduct in lying to the Commission about these matters, both in his initial response letter and in his sworn statement. Not only did he lie to the Commission in his response letter of November 20, 2001, he lied in his sworn testimony to the OSC five months later. It was not until December 17, 2002, fourteen months after he was notified of this investigation that he told the truth and stipulated to the facts. However, at that point he had little choice, for it was not until after he was presented with irrefutable truth in the form of the tapes and transcripts which showed him unequivocally making the statements that he had previously denied making that he entered into the stipulation. Lying to the Commission in his sworn statement is "conduct while in office which would constitute a felony"[18] and "willful misconduct relating to his official duties," for which removal is an appropriate penalty. Further, lying to the Commission in a sworn statement taken as part of an investigation is simply conduct which this Court cannot and will not tolerate. As this Court stated long ago in Stanley v. Jones, 201 La. 549, 9 So.2d 678, 683 (1942), wherein it removed a district court judge for lying:
The office of judge is one in which the general public has a deep and vital interest, and, because that is true, the official conduct of judges, as well as their private conduct is closely observed. When a judge, either in his official capacity or as a private citizen, is guilty of such conduct as to cause others to question his character and morals, the people not only lose respect for him as a man but lose respect for the court over which he presides as well.
As recognized by other jurisdictions, "Honesty is a `minimum qualification' expected of every judge." Inquiry Concerning Couwenberg, No. 158, Decision and Order (Aug. 15, 2001). In Couwenberg, the judge made false statements in personal data questionnaires he filled out when seeking judicial office and also lied in a sworn statement taken during the judiciary commission's investigation. In deciding that removal was the appropriate discipline, the commission stated:
Second, Judge Couwenberg lied in writing and in testimony under oath to the commission during the course of its investigation. *450 The Supreme Court has noted that there "are few judicial actions in our view that provide greater justification for removal from office than the action of a judge in deliberately providing false information to the Commission in the course of its investigation." (Adams [v. Commission on Judicial Performance, 10 Cal.4th 866, 914, 42 Cal.Rptr.2d 606, 897 P.2d 544 (1995).]) When his misrepresentation that he was in the Army in Vietnam was exposed, Judge Couwenberg told the commissionin testimony and in writingthat he had been employed by the CIA in Laos. When the CIA refuted this lie, Judge Couwenberg testified that he was in Laos working for some other agencya representation that the masters found to be a lie. In addition, Judge Couwenberg volunteered in a statement under oath that he had a master's degree. At the hearing before the masters, he basically admitted that his was perjury. Any discipline other than removal for such blatant misrepresentations might well encourage others who are investigated by the commission to prevaricate and develop faulty memories. (Emphasis added).
Id at 14. Other jurisdictions have likewise removed judges for lying before a judiciary commission. See In re Ferrara, 458 Mich. 350, 582 N.W.2d 817, 822 (1998) (removing a judge for making untruthful and misleading statements to the public and the press, for attempting to submit fabricated evidence two times at the hearing before the Michigan Judicial Tenure Commission, and for her unprofessional and disrespectful conduct during the disciplinary proceedings); Matter of Collazo, 91 N.Y.2d 251, 668 N.Y.S.2d 997, 691 N.E.2d 1021 (1998) (removing a judge for making inappropriate remarks about a female law intern, making false denials under oath before the commission about his conduct, and lying to judicial screening panels about commission investigations); Mississippi Comm'n on Judicial Performance v. Milling, 651 So.2d 531 (Miss.1995) (removing a judge for lying to the judiciary commission about her intent to continue her romantic involvement with a known fugitive and for actions she took in connection with the fugitive's case); In re Anderson, 451 So.2d 232 (Miss.1984) (removing a judge for knowingly perjuring himself at a complaint hearing before the Mississippi Commission on Judicial Performance).[19]

CONCLUSION
Upon review of the record, we conclude that the most severe discipline is warranted in this case. Judge King's campaign misconduct, and his lying to the Commission twice, over a period of fourteen months when he had ample chance to admit his misconduct, is so prejudicial to the administration of justice, not only in his *451 section of court, but throughout the judicial system, that he cannot be allowed to remain on the bench. In our view, any discipline less than removal would undermine the entire judicial discipline process and diminish the strict obligation of judges to be truthful in the face of an investigation by the Commission.

DECREE
Accordingly, for the reasons stated herein, it is ordered, adjudged, and decreed that the respondent, Judge C. Hunter King of Section M of the Civil District Court for the Parish of Orleans, State of Louisiana, be, and is hereby, removed from office, and that his office be, and is hereby, declared to be vacant. Further, the respondent is ordered pursuant to La. Sup.Ct. Rule XXIII, § 26 to refrain from qualifying as a candidate for judicial office for five years and until certified by this court as eligible to become a candidate for judicial office. Finally, we cast the respondent with $693.50 of the costs incurred in the investigation and prosecution of his case.
REMOVAL FROM JUDICIAL OFFICE ORDERED.

ORDER
Considering our judgment of October 21, 2003, it is hereby ordered that Judge C. Hunter King of the Orleans Parish Civil District Court, division "M" be immediately suspended and disqualified from exercising any judicial functions pending the finality of the October 21, 2003 judgment.
For the court
/s/ Pascal F. Calogero, Jr. Justice, Supreme Court of Louisiana
NOTES
[1] Each then submitted memorandum of law briefing the recommended penalty for Judge King's misconduct, with the OSC recommending removal and Judge King arguing for a three-month suspension.
[2] Judge King was first elected to the bench in October 1999 and assumed his office in November 1999; he was re-elected to a full six-year term in October 2002.
[3] The letter from Judge King to Ms. Wallace, dated October 2, 2001, stated as follows:

On Monday, September 24, 2001 in a weekly staff meeting for Division "M," you were asked about the status of your outstanding transcripts, because lawyers were complaining. You expressed to me as well as the rest of my staff by saying "Judge, I suggest you look for another court reporter, because I can not keep up with all of my work and your expectations of me as a court reporter."
After careful consideration of your request and constant complaints from lawyers of the timeliness for providing them with transcripts, I have decided as of Wednesday, October 3, 2001 your services as a court reporter for Division "M," will no longer be needed.
I have contacted Mrs. Michelle Rodney, Office Manager for Judicial Expense Fund to advise her of this change and she will submit to you at the above address your remaining pay.
[4] Ms. Wallace responded by letter, dated October 3, 2001, to Judge King in part as follows:

Just to set the record straight, from my point of view, I certainly did not resign, so you were not accepting my resignation. On Tuesday, October 2, 2001, after a weekly staff meeting, in the presence of Ms. Brossett, you fired me based on some untrue statements, which you claim in your letter of termination that I made.
[5] In the September 13, 2001, staff meeting, Judge King gave the following instructions:

It ain't about the stamps. It's about the affect of walking into the building saying is attorney thus and so here, and if they say, yeah, well then giving it to them in dropping them off, I'm with the finance committee of C. Hunter King and I'm dropping some invitations to the Judge's fundraiser. You ain't trying at [sic] point to collect, unless of course you've already talked to that lawyer and said, look, can I get you to buy three or four tickets and they said, yeah, why don't you just put them in the mail or drop them off to me. I'll tell you what, if you pop by to pick up the check and I'll bring them over on Friday. Unless you've already pre-called, it eliminates the down time of what? That's one person less everybody has to call when they go to Bernard's office or Ed Shanklin's office or John Dillon's office to call back to follow up, did you get the tickets, when can somebody swing by and pick them up.
...
Cause we're going to have all this done. There are at least four other judges having fund raisers in the month of October. Now you see why it's important now to walk it. Nobody else is going to be walking theirs. Nobody else is going to see a visible individual to say, hey, I gave it to your secretary or I already called before I came.
[6] Judge King asked his staff to pay particular attention to the lawyers who appeared in his division of court. In one meeting, Judge King gave instructions to his staff concerning the manner in which the lawyers should be approached:

KELLY:
... I mean just have them on the list and then just make a phone call to them and say, I'm Judge King's law clerk. I dealt with you on such and such, and I was just wondering, you know, the Judge is having a fund raiser, can I sell you two tickets.
JUDGE KING:
You can do it that way as long as you don't call from this office.
ELROY:
We can let them know we're the Judge's law clerks?
JUDGE KING:
Well, I think you need to call and say, my name is thus and so, I'm working on the Judge's finance committee.
[7] During the first week of October 2001, Judge King virtually suspended the operation of his division of court so that his staff could devote all or most of their time to activities directly related to his campaign for re-election.
[8] The Commission alleged Judge King's conduct violated the following provisions of the Code of Judicial Conduct: Canons 1 (a judge shall uphold the integrity and independence of the judiciary), 2 A (a judge shall respect and comply with the law and act in a manner that promotes public confidence in the integrity and impartiality of the judiciary), 2 B (a judge shall not allow family, social, political, or other relationships to influence judicial conduct or judgment), 3 B(2) (a judge shall require his staff to observe the standards of fidelity and diligence that apply to the judge), 7 B(1)(b) and (c) (relating to campaign conduct), and 7 D(1) (a judge shall not personally solicit or accept campaign contributions). The Commission further alleged that Judge King engaged in willful misconduct relating to his official duty, engaged in persistent and public conduct prejudicial to the administration of justice that brought the judicial office into disrepute, and engaged in conduct that constituted a felony (perjury in one case and public salary extortion in the other), all in violation of La. Const. art. V, § 25(C).
[9] Although the parties stipulated to many of the facts and legal conclusions, they were unable to agree upon a recommended penalty. Prior to the hearing, Judge King submitted a memorandum to the Commission in which he argued that an appropriate penalty would be a three-month suspension from judicial office. The OSC, on the other hand, argued that removal was the appropriate penalty.
[10] Notably, Judge King did not stipulate that he engaged in conduct constituting a felony, as charged in the formal charges. However, the OSC argued that Judge King's conduct satisfies the legal definition of perjury, a felony defined by La. R.S. 14:123(A) and (B), and public salary extortion, a felony defined by La. R.S. 14:136. Following its review of the matter, the Commission concluded that Judge King "lied to the Commission staff while he was under oath and represented by legal counsel, which demonstrates to the Commission that he violated the Code of Judicial Conduct and the Louisiana Constitution of 1974, and as a result he should be publicly sanctioned (the Commission members do not think it is necessary for them to make the legal determination that he did or did not commit a felony.)." Furthermore, the Commission found Judge King "required his court staff to perform work for him toward selling tickets to a political fund raiser, even when some of them told him they needed the time to perform their work duties. Based on his conduct and his statements in office meetings, Barbara Wallace thought she would lose her job, and indeed, she thought she was terminated for not cooperating with this requirement. This demonstrates to the Commission that Judge King violated the Code of Judicial Conduct and the Louisiana Constitution of 1974, and as a result he should be publicly sanctioned, but the Commission members do not think it is necessary for them to draw the legal conclusion that he did or did not commit a crime as a result, including the crime of public salary extortion."
[11] In Chaisson, this court, citing Matter of Deming, 108 Wash.2d 82, 736 P.2d 639, 659 (1987), set forth a non-exclusive list of factors a court may consider in imposing discipline on a judge:

To determine the appropriate sanction, we consider the following nonexclusive factors:
(a) whether the misconduct is an isolated instance or evidenced a pattern of conduct;
(b) the nature, extent and frequency of occurrence of the acts of misconduct; (c) whether the misconduct occurred in or out of the courtroom; (d) whether the misconduct occurred in the judge's official capacity or in his private life; (e) whether the judge has acknowledged or recognized that the acts occurred; (f) whether the judge has evidenced an effort to change or modify his conduct; (g) the length of service on the bench; (h) whether there have been prior complaints about this judge; (i) the effect the misconduct has upon the integrity of and respect for the judiciary; and (j) the extent to which the judge exploited his position to satisfy his personal desires.
[12] In its recommendation, the Commission noted that during his suspension, Judge King "will remain bound by the constitutional prohibition against a judge practicing law," and further stated that "the Commission is aware that their recommendation, if accepted by the justices, will deprive Judge King of salary in the range of $100,000, which will work a severe hardship upon him." The Commission concluded "that such a severe sanction is nonetheless warranted."
[13] As stated above, after the recommendation was filed in this court, Judge King and the OSC filed a motion captioned "Joint Waiver of Oral Argument and Briefing and Consent to One-Year Suspension Without Salary." Judge King also filed a motion entitled "Unopposed Motion of Judge C. Hunter King Regarding Commencement of Suspension Without Salary," in which he requested that his suspension commence effective September 1, 2003. The court denied both motions on June 19, 2003.
[14] See footnote 11, infra.
[15] CANON 7 of the Code of Judicial Conduct provides, in pertinent part:

A Judge Or Judicial Candidate Shall Refrain From Inappropriate Political Activity
A. Political Conduct in General.
(1) A judge or judicial candidate shall not:
(a) act as a leader or hold any office in a political organization;
(b) publicly endorse or publicly oppose another candidate for public office;
(c) make speeches on behalf of a political organization or a candidate for public office;
(d) except to the extent permitted by these Canons, solicit funds for, pay an assessment to, or make a contribution to a political organization or candidate or purchase tickets for political party dinners or other campaign functions.
B. Campaign Conduct.
(1) A judge or judicial candidate:
(a) shall maintain the dignity appropriate to judicial office and act in a manner consistent with the integrity and independence of the judiciary, and should encourage the members of the candidate's family to adhere to the same standards of political conduct in support of the candidate as apply to the candidate;
(b) shall prohibit employees and officials who serve at the pleasure of the candidate, and should discourage other employees and officials subject to the candidate's direction and control from doing on the candidate's behalf what the candidate is prohibited from doing under this Canon;
(c) except to the extent permitted by these Canons, shall not authorize or knowingly permit any person to do for the candidate what the candidate is prohibited from doing under this Canon;
(d) shall not
(i) make pledges or promises of conduct in office other than the faithful and impartial performance of the duties of the office;
(ii) make statements that commit or appear to commit the candidate with respect to cases, controversies, or issues that are likely to come before the court;
(iii) knowingly misrepresent the identity, qualifications, present position or other fact concerning the candidate or an opponent; or
(iv) while a proceeding is pending or impending in any court, make any public comment that might reasonably be expected to affect its outcome or impair its fairness.
(e) may respond to personal attacks or attacks on the candidate's record as long as the response does not violate Canon 7 B(1)(d).
C. A Judge or a Judicial Candidate May:
(1) At any time
(a) attend political gatherings;
(b) identify himself or herself as a member of a political party;
(2) During his or her candidacy
(a) speak to gatherings on his or her own behalf;
(b) appear in newspaper, television or other media advertisements supporting his or her candidacy;
(c) distribute pamphlets or other promotional campaign literature supporting his or her candidacy;
(d) contribute to a political organization and/or be included on a political ticket or endorsement.
D. Campaign Committees
(1) A judge or judicial candidate shall not personally solicit or accept campaign contributions. A judge or judicial candidate may personally solicit publicly stated support.
(2) A candidate may also establish committees of responsible persons to conduct campaigns for the candidate through media advertisements, brochures, mailings, candidate forums and other means not prohibited by law. Such committees may solicit and accept campaign contributions, manage the expenditure of funds for the candidate's campaign and obtain public statements of support for his or her candidacy. However, no undue pressure or coercion may be applied in such solicitation.
(3) Such committees are not prohibited from soliciting or accepting campaign contributions or public support from lawyers. A candidate's committee may solicit contributions for the candidate's campaign no earlier than two years before the primary election. Contributions may be solicited after the last election in which the candidate participated only for the purpose of extinguishing the campaign debt resulting from that election. After the campaign debt is extinguished, post-election campaign contributions may not be solicited or accepted.
(4) A candidate shall not use or permit the use of campaign contributions except as provided by law.
[16] La. R.S. 14:136 provides:

A. Public salary extortion is committed when any person shall:
(1) Solicit or receive, or attempt to solicit or receive, either directly or indirectly, the payment of any money or other thing of value from any public officer or public employee to himself or any other person or political organization, through any means or form whatsoever and for any purpose whatsoever, when such payment is obtained or solicited upon suggestion or threat that the failure to make such payment shall result in the loss or impairment of value to such officer or employee of his office or employment ...
La. R.S. 14:136(B) provides that the criminal penalty for public salary extortion is imprisonment of not more than five years with or without hard labor or a fine of not more than five thousand dollars or both.
[17] We noted that his conduct did not fall under "felonious criminal conduct" because it was a first offense, second offense being a felony.
[18] "Perjury" is defined as follows:

A. Perjury is the intentional making of a false written or oral statement in or for use in a judicial proceeding, any proceeding before a board or official, wherein such board or official is authorized to take testimony, or before any committee or subcommittee of either house or any joint committee or subcommittee of both houses of the legislature. In order to constitute perjury the false statement must be made under sanction of an oath or an equivalent affirmation and must relate to matter material to the issue or question in controversy.
B. It is a necessary element of the offense that the accused knew the statement to be false, but an unqualified statement of that which one does not know or definitely believe to be true is equivalent to a statement of that which he knows to be false.
La. R.S. 14:123(A) & (B). La. R.S. 14:123(C) provides that "[w]hoever commits the crime of perjury shall be punished ... by a fine of not more than ten thousand dollars or imprisonment at hard labor for not more than five years, or both."
Again, we express no opinion about whether Judge King could, should, or would be prosecuted and convicted for perjury as a result of his lying to the Judiciary Commission under oath in this instance. There has been no real legal argument either way to this Court. However, from the face of the stipulated facts, it appears that this is conduct that would constitute a felony.
[19] Other courts have removed judges for lying in various other situations. See In re Eagen, 814 A.2d 304, 2002 Pa. Jud. Disc. LEXIS 3 (Jud.Disc.2002) (removing a judge who lied to FBI agents in an unsworn, untaped interview); In re Samay, 166 N.J. 25, 764 A.2d 398 (2001) (removing a judge for presiding over a case in which he should have recused himself and for lying in a police report and affidavit); In re Mulroy, 94 N.Y.2d 652, 709 N.Y.S.2d 464, 731 N.E.2d 120 (2000) (removing a judge for racial slurs and epithets, intemperate behavior, and giving false testimony as a character witness in a criminal trial); In re Ford-Kaus, 730 So.2d 269 (Fla.1999) (removing a judge from office for lying about bills, about the authorship of a brief, about the reasons for inaccurate bills, and the date of service on a certificate of service, all pre-judge conduct); In re Disciplinary Proceeding Against Ritchie, 123 Wash.2d 725, 870 P.2d 967 (1994) (removing a judge for submitting misleading travel vouchers over a five-year period for trips which were only incidentally related to judicial business).