874 So.2d 805 (2004)
In re Judge Monty L. DOGGETT.
No. 2004-O-0319.
Supreme Court of Louisiana.
May 25, 2004.
*806 Steven R. Scheckman, Special Counsel, Mary F. Whitney, Asst. Special Counsel, Office of Special Counsel.
Nancy E. Rix, Commission Legal Counsel, Hugh M. Collins, PhD, Chief Executive Counsel, Judiciary Commission of Louisiana.
Elizabeth A. Ralson, New Orleans, Robert M. Contois, Jr., Monty Doggett, Gerard F. Thomas, Jr., Natchitoches, Counsel for Respondent.
TRAYLOR, J.
This judicial disciplinary proceeding comes before the court on the recommendation of the Judiciary Commission of Louisiana ("the Commission") that Judge Monty L. Doggett of the 10th Judicial District Court, Parish of Natchitoches, be removed from office. The Office of Special Counsel ("OSC") conducted an investigation, and then filed Formal Charge No. 0194 against Judge Doggett, accusing him of persistent public intoxication while performing judicial duties. After a hearing, the Commission determined that Judge Doggett violated Canons 1, 2 A, 3 A(2),3 A(3), and 3 A(7) of the Code of Judicial Conduct and La. Const. art. V, § 25(C). The Commission then recommended to the court that it remove Judge Doggett from the bench. After a thorough review of the evidence, we find that Judge Doggett's persistent public intoxication while performing judicial duties warrants removal from office.

FACTS AND PROCEDURAL HISTORY
Judge Doggett was elected to judicial office in 1996, and was re-elected to a second term in October 2002. In June 2002, the OSC received an anonymous complaint[1] that Judge Doggett "has been in a drunken state while at the courthouse" on "more than one occasion during the past few months." The complaint further alleged that court had to be canceled one day because Judge Doggett was "too drunk to come out of chambers into the courtroom," and that the judge's memory and concentration were impaired by alcohol to the extent that his judicial decisions have been affected. The complainant also suggested that Judge Doggett's condition is well known to courthouse employees, elected officials, and lawyers in the Natchitoches community.
In response to the initial inquiry about the complaint, dated October 11, 2002, Judge Doggett admitted that he is an alcoholic and has been so for more than thirty years. Judge Doggett pointed out that he has had significant periods of sobriety, but he also admitted that he had relapsed on *807 several occasions. Nevertheless, Judge Doggett suggested that he was "on the road to recovery."
On December 10, 2002, the Commission filed a recommendation of interim disqualification in this court, having found that Judge Doggett's continuation on the bench posed a "substantial threat of harm to the public and to the administration of justice." By order dated December 19, 2002, this court accepted the Commission's recommendation and disqualified Judge Doggett on an interim basis with pay.
On February 26, 2003, the Commission filed Formal Charge No. 0194 against Judge Doggett, alleging that his alcoholism and his inability to maintain sobriety have resulted in his inability to perform judicial duties and his significant delay in deciding cases, including five cases specified in the Formal Charge.
Judge Doggett answered the Formal Charge on March 28, 2003. He admitted that he is an alcoholic and that his illness has interfered with his ability to properly perform his judicial duties; however, he denied any willful or intentional conduct. Judge Doggett maintained that his alcoholism is not permanent and is curable, and he pointed out that "it can be handled with proper treatment that he has and is receiving."
Prior to the hearing on the Formal Charge, the parties stipulated to the admission of Judge Doggett's medical records detailing his treatment for alcoholism and alcohol-related illnesses. The parties further stipulated that if called to testify, the medical professionals who generated the records would testify in accordance with the information contained therein.[2]
The Commission conducted a hearing on the Formal Charge on October 17 and 18, 2003. Numerous witnesses testified that Judge Doggett is good judge when he is not drinking, and that he is a nice person. Nevertheless, the witnesses also testified that Judge Doggett has appeared visibly intoxicated on the bench and in chambers. On these occasions, Judge Doggett slurred his speech, was disoriented and unable to focus, was shaky, and walked in an unsteady manner.
On one occasion, Deputy Burl Lee, a bailiff employed by the 10th Judicial District Court, personally witnessed Judge Doggett drinking at the courthouse. Deputy Lee testified that one Saturday when court was in session, he saw the judge reach into his desk drawer, pull out a bottle, and take a drink from it. This occurred after Judge Doggett had put on his robe and was about to enter the courtroom to take the bench. Deputy Lee later went into the judge's office to see what he had been drinking and discovered it was alcohol in a soft drink bottle. According to Deputy Lee, Judge Doggett frequently smelled of alcohol or heavy cologne.
Two law enforcement officers who frequently appeared before the court confirmed that Judge Doggett issued arrest warrants when he was drunk. Kevin Stafford, a juvenile investigator for the Natchitoches Parish Sheriff's Office, testified that the judge issued warrants even though "he could not visualize the warrant or what it was pertaining to or anything like that. He was unable to find the wording."[3] *808 State Trooper Steven Pezant additionally testified that Judge Doggett was impaired when he issued a DWI warrant.
At the request of assistant district attorneys concerned over Judge Doggett's appearance of intoxication, Natchitoches Parish District Attorney Van Kyzar went to the courthouse to personally observe Judge Doggett's behavior. On the first occasion, Mr. Kyzar testified that Judge Doggett "was slurring his words. He wasalthough he was able to speak, he was not speaking completely coherently, fragmented sentences." On one of these occasions, Mr. Kyzar testified there was concern about him leaving the building unaccompanied, but the judge got out of the building and into his vehicle before anyone could stop him. On another occasion, a deputy drove the judge home because of concern over the judge's intoxicated state.
Due to Judge Doggett's intoxicated state, court had to be canceled on other days, including the day of the Dyess v. Butler child custody case. Attorney Dee Hawthorne, who represented Mr. Dyess in the matter, testified that when she and her opposing counsel appeared for a hearing they both realized that Judge Doggett was impaired. They did not know how to proceed and, as a result, they consulted with Judge Eric Harrington at the 10th Judicial District Court. After the meeting with Judge Harrington, the two lawyers jointly asked for a continuance of the proceeding. Judge Doggett admitted before the Commission that he was intoxicated the day the attorneys appeared and that the case was continued.
On the morning of December 4, 2002, Judge Doggett was impaired by alcohol to the extent that his staff cleared the public from the hallways outside his courtroom so he could be carried out of his office by sheriff's deputies. Despite his staff's efforts, the public saw Judge Doggett as he was escorted from the courthouse. The incident was the subject of a December 6, 2002 front-page article in The Natchitoches Times. Notably, this incident occurred before 10:00 a.m.
Stephanie Kaufman, Judge Doggett's secretary, estimated that she saw him at work under the influence about twenty times, both in chambers and in the courtroom. Immediately prior to his interim disqualification in December 2002, she saw him impaired with regularity. According to Ms. Kaufman, on a few occasions, Judge Doggett would come in and start court, then take a break and never come back. Ms. Kaufman testified that it was difficult to match a day with an incident because some days Judge Doggett was functional and other days he would leave. On at least one occasion when Judge Doggett left work unexpectedly and did not return, she and another court employee went to Judge Doggett's home to check on him. Although it was early in the afternoon, Ms. Kaufman testified that Judge Doggett had obviously been drinking. In addition, Ms. Kaufman testified that she believed the courthouse community was aware of Judge Doggett's problem because attorneys who came in contact with Judge Doggett would ask her if he was okay and mention that they smelled something, usually heavy cologne. She also testified that she was unsure how much the general community was aware of Judge Doggett's alcoholism, nor if they were aware of the seriousness or the extent of the problem. Finally, Ms. Kaufman testified that although she would not personally object to Judge Doggett's return to the bench if he participated in Alcoholics Anonymous and was monitored by the Lawyers Assistance Program ("LAP"), she still had trust issues with him because "he told me he did things like *809 [participate in Alcoholics Anonymous] then, and I found out he didn't."
In addition to the Dyess case, Charles Whitehead, Jr., an attorney, testified concerning Judge Doggett's failure to decide some of his cases in a timely manner. He testified that he personally saw Judge Doggett intoxicated in chambers on two occasions. According to Mr. Whitehead, Judge Doggett was intoxicated when he rendered the decision in State v. Todd. Mr. Whitehead testified that while they were in the courtroom, Judge Doggett pointed at Mr. Whitehead and said, "you win," which he thought was unusual behavior for Judge Doggett. Mr. Whitehead, himself a recovering alcoholic, testified that he offered to take Judge Doggett to Alcoholics Anonymous but that Judge Doggett never responded to his invitation. In total, investigation revealed that Judge Doggett's alcoholism resulted in significant delays in several cases, including, but not limited to Warner v. Natchitoches Parish School Bd.; State v. Desnee Bullock, C-2621 B; Russell E. Gallaghan, Jr. v. Sidney Thornton; State v. Todd Smith and Tammy Hemperly; and Dyess v. Butler.[4]
Retired Judge Peyton Cunningham, Jr., who is one of two judges who have handled Judge Doggett's docket since he was disqualified, testified, among other things, as to the effect of Judge Doggett's failure to keep up with his workload. Judge Cunningham testified that Judge Fred Sexton had "caught up on a tremendous amount of work" before Judge Cunningham was assigned to the court. Judge Cunningham described a civil suit for damage to property caused by fire, where the plaintiffs "lost everything they had;" the case was filed on January 2000, and Judge Doggett heard it July 23-24, 2002. Judge Cunningham rendered a decision June 24, 2003, a delay created by Judge Doggett's debilitated state in 2002.
Finally, Judge Doggett himself admitted that he made judicial decisions while he was impaired and that his condition was obvious to the public. He also admitted that he went to the courthouse more impaired than anyone realized. Judge Doggett admitted to these past incidents, but testified that if he were to drink again in the future, it would be obvious and the problem would be reported. Judge Doggett testified that he experienced trauma as a child when he witnessed his young brother being hit and killed by an automobile. He described stressful situations in his private life that he faced without drinking since he had received treatment at the Talbott Recovery Center in Atlanta, implying that future stressful events will not cause him to resume drinking alcohol.
Judge Doggett's alcoholism dates back to 1969, when he was eighteen years of age. He initially sought treatment for alcoholism in the late 1970's and again in 1989, following which he was able to maintain sobriety for a period of approximately eleven years. In 2000, Judge Doggett started drinking to relieve pain caused by *810 an undiagnosed medical condition. The drinking soon spiraled out of control, even after the source of the pain was cured by surgery to remove a mass of scar tissue in Judge Doggett's lower abdomen and groin.
In late 2000, Judge Doggett began a long and difficult road to recovery. On December 11, 2000, Judge Doggett was admitted on an involuntary basis to the inpatient alcohol treatment program at Palmetto Addiction Recovery Center in Rayville, Louisiana as the result of an intervention by Judge Doggett's wife, Judge Eric Harrington of the 10th Judicial District Court, and Natchitoches Parish Clerk of Court Louie Bernard. After completing the 30-day inpatient program, Judge Doggett checked out of Palmetto against medical advice. Although Palmetto staff recommended that Judge Doggett undertake long-term counseling, there is no record of follow-up. Thereafter, he started drinking "on and off" until the spring 2002, when things started "deteriorating badly."
On April 18, 2002, Judge Doggett was hospitalized at Christus Coushatta Health Care Center for four days for treatment for hypovolemia.[5] Judge Doggett abstained from alcohol for approximately two weeks following his release from Christus Coushatta, then relapsed. During an outpatient counseling session with Shreveport psychiatrist Dr. Paul Ware on May 8, 2002, Judge Doggett admitted that he drank a pint of vodka the day before the session. Dr. Ware concluded that Judge Doggett "shows a high relapse potential by history," and he recommended counseling and five AA meetings per week. Judge Doggett was scheduled to attend another session with Dr. Ware on May 16, 2002; however, on the day of the appointment, he canceled and did not reschedule.
Six months later, on October 14, 2002, Judge Doggett was hospitalized at Christus Coushatta once again for treatment of hypovolemia. He reported that he was drinking at least a fifth of vodka per day, seven days a week. By letter to Dr. Hugh Collins dated October 17, 2002, Judge Doggett requested an "indefinite medical leave" from his judicial duties. On October 22, 2002, the day after he was discharged from Christus Coushatta, Judge Doggett was admitted on an inpatient basis to The Right Step alcohol treatment program at St. Christopher's Halfway House in Baton Rouge. Despite having gone through the detoxification protocol at Christus Coushatta, Judge Doggett was "very sick" upon admission to The Right Step and had to be carried to his room; when the staff obtained his medical history, Judge Doggett's alcohol use was noted as "Vodka (½ pint yesterday)." Judge Doggett was discharged from The Right Step on November 20, 2002. His prognosis at that time was described as guarded.
On December 5, 2002, Judge Doggett was readmitted to Christus Coushatta for four days for treatment of hypovolemia, his third such hospitalization in 2002. Judge Doggett reported that he remained sober for three or four days after leaving the Right Step, but then resumed drinking. In a letter to the Commission dated the same day, Judge Doggett admitted that he is "disabled, physically and mentally, to function in any capacity as Judge." Judge Doggett stated that it was his intention to seek disability retirement benefits from the Louisiana State Employees' Retirement System, and he asked that he be placed "on voluntary suspension" while his application for disability was pending. Judge Doggett further indicated that he *811 would resign from office when his request for disability was approved.
On December 27, 2002, pursuant to a protective custody order, Judge Doggett was involuntarily admitted to an inpatient program at Brentwood Hospital in Shreveport. His medical records reflect that he informed the staff that he intended "to leave tomorrow after I figure out who put me in here." Judge Doggett admitted that he drank a quart of vodka the night prior to his admission, and the Brentwood staff observed that he "smells of alcohol and appears unkempt." The following day, December 28, 2002, Judge Doggett signed a notice requesting that he be released from Brentwood within 72 hours. This request was denied. On December 31, 2002, a physician signed an emergency certificate pursuant to La.Rev.Stat. 28:53,[6] certifying that Judge Doggett is "gravely disabled" as a result of substance abuse and was unwilling to seek voluntary admission to a treatment facility. On January 2, 2003, Judge Doggett was evaluated by the coroner to assess whether his involuntary confinement should continue. Judge Doggett told the coroner that he was willing to remain at Brentwood on a voluntary basis, and accordingly, the coroner concluded that Judge Doggett "is not a proper subject for emergency admission." A coroner's emergency certificate to that effect was signed at 7:50 p.m. on January 2, 2003. Notwithstanding his representations to the coroner, moments later Judge Doggett signed a notice requesting that he be released from Brentwood within 72 hours.
On January 6, 2003, Judge Doggett began attending a daily half-day outpatient treatment program at Woodcrest Healthcare, Inc., a community mental health center in Natchitoches. On January 24, 2003, the Woodcrest staff observed that Judge Doggett was "secretive" and "withdrawn," that his face was flushed, and that he had a strong odor of cologne about him. In response to questions by the staff on January 27, 2003, Judge Doggett denied repeatedly that he had been drinking. However, on January 29, 2003, Judge Doggett admitted that he had consumed alcohol the day before.
On January 31, 2003, Judge Doggett filed a pleading in this court to amend his response to the Commission's recommendation of interim disqualification. Judge Doggett represented that he was no longer disabled, that he was not seeking disability from the state retirement system, and that he did not intend to resign from office. Judge Doggett also reported that he had "successfully completed" the Brentwood program and that he was attending the Woodcrest program. Judge Doggett was discharged from the Woodcrest program on February 7, 2003.
On February 28, 2003, Judge Doggett was admitted on an involuntary basis to the inpatient alcohol treatment program at Talbott Recovery Campus in Atlanta, *812 Georgia. Judge Doggett was driven to the Talbott facility by a sheriff's deputy, who at Judge Doggett's direction stopped on the way so that Judge Doggett could buy alcohol. Judge Doggett informed the Talbott staff that he was drinking about a quart of vodka per day prior to his admission, including drinking before going to work.
Judge Doggett was discharged from Talbott on May 31, 2003, with recommendations for continuing care to include: (1) attending 90 AA meetings in a 90-day period and four to seven meetings weekly thereafter for the duration of the continuing care contract; (2) obtaining and utilizing a 12-step sponsor; (3) participating in the Louisiana Lawyers Assistance Program (LAP); and (4) participating in Talbot continuing care functions beginning in August 2003 and continuing with one visit per year for five years thereafter. Judge Doggett represents that he has been sober since the day he was admitted to Talbott, and he credits the facility with changing his life. At present time, the Commission stipulates that Judge Doggett has been sober since entering the Talbott facility.
Based on the evidence, the Commission concluded that from 2000 through December 19, 2002, Judge Doggett was significantly impaired on numerous occasions while performing judicial duties, which violated Canons 1, 2 A, 3 A(2), and 3 A(3) of the Code of Judicial Conduct.[7] In addition, the Commission concluded that, as a result of his alcoholism, Judge Doggett failed to perform work in a timely manner and issued warrants while intoxicated in violation of Canons 3 A(1) and 3 A(7).[8] The Commission found that Judge Doggett's conduct constituted "persistent and public behavior prejudicial to the administration of justice that brought the judicial office into disrepute," due to the public nature and press coverage surrounding his conduct. Ultimately, the Commission recommended that Judge Doggett should not be returned to the bench, regardless of whether his removal was termed involuntary retirement as opposed to removal.
Judge Doggett admits and apologizes for his public intoxication, and admits that his conduct violated the relevant portion of Canons 2 and 3, and constituted persistent public misconduct in violation of La. Const. art. V, § 25(C). However, Judge Doggett argues that his misconduct was not willful or intentional according to La. Const. art. V, § 25, and that his misconduct does not warrant removal from office.

DISCUSSION
This court is vested with exclusive original jurisdiction in judicial disciplinary proceedings. La. Const. art. V, § 25(C). La. Const. art. V, § 25 sets forth the grounds for disciplinary action, providing in pertinent part:
On recommendation of the judiciary commission, the supreme court may censure, *813 suspend with or without salary, remove from office, or retire involuntarily a judge for willful misconduct relating to his official duty, willful and persistent failure to perform his duty, persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute, conduct while in office which would constitute a felony, or conviction of a felony.
In addition to these grounds, this court has recognized that any violation of the Code of Judicial Conduct, without more, may serve as grounds for removal. In re King, 03-1412 (La.10/21/03), 857 So.2d 432, 445; In re Hunter, 02-1975 (La.8/19/02), 823 So.2d 325, 335.
Before this court can impose discipline, the charge or charges against a judge must be proved by clear and convincing evidence. In re King, 857 So.2d at 445; In re Hunter, 823 So.2d at 328. This standard requires that the level of proof supporting the charge or charges against a judge must be more than a mere preponderance of the evidence, but less than beyond a reasonable doubt. In re Hunter, 823 So.2d at 328.

Willful and Persistent Failure to Perform Duty
Judge Doggett first argues that his conduct did not constitute a willful and persistent failure to perform his duty in violation of La. Const. art. V, § 25(C).
The Commission did not find that Judge Doggett's conduct constituted a willful and persistent failure to perform his duty in violation of La. Const. art. V, § 25(C), nor is such a determination necessary to support the proposed discipline in this case. In re Wilkes, 403 So.2d 35, 40 (La.1981); In re Chaisson, 549 So.2d 259, 266 (La. 1989). Because Judge Doggett has admitted to the relevant conduct and admitted that his public intoxication violated the Code of Judicial Conduct and constituted "persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute," this court pretermits the issue of whether Judge Doggett's conduct was a clear and convincing willful and persistent failure to perform his duty. Under these circumstances, this court's responsibility is limited to determining the sanction to impose for the violations. In re King, 857 So.2d at 445; In re Johnson, 96-1866 (La.11/25/96), 683 So.2d 1196, 1199; In re Decuir, 95-0056 (La.5/22/95), 654 So.2d 687, 692.

Imposition of Discipline
Having pretermitted whether Judge Doggett's behavior was a willful and persistent failure to perform his duty, we next address whether Judge Doggett's conduct, as admitted, violated the relevant portions of the Code of Judicial Conduct and is that conduct "persistent and public conduct prejudicial to the administration of justice that brings the office into disrepute" to such an extent that he should be removed from office. We agree with the Commission and find that Judge Doggett's conduct warrants removal.
Although this court has never addressed removal in a case involving alcohol abuse while performing judicial duties, the guidelines set out in the Louisiana Constitution of 1974 clearly provide this court discretion in determining which types of misconduct warrant removal. As this court stated in In re Whitaker, 463 So.2d 1291, 1303 (La.1985):
The most severe discipline should be reserved for judges who use their office improperly for personal gain; judges who are consistently abusive and insensitive to parties, witnesses, jurors and attorneys; judges who because of laziness or indifference fail to perform their *814 judicial duties to the best of their ability; and judges who engage in felonious criminal conduct.
The conduct recognized in Whitaker, however, is not an exclusive list of the types of conduct for which a judge may be removed from office. In re King, 857 So.2d at 446. Both La. Const. art. V, § 25 and the Code of Judicial Conduct allow removal for a broader range of offenses than the illustrative list set forth in Whitaker. Id.
Judge Doggett first argues that his constituency accepted his alcohol problem and accepted his concomitant conduct on the bench because he was re-elected after his alcoholism was made public; therefore, Judge Doggett maintains that this court should not remove him from the bench based on public intoxication while performing judicial duties. As the Commission noted, it is unclear from the record that the general public knew the extent of Judge Doggett's battle with alcoholism. General public awareness of the extent of Judge Doggett's impairment and its effect on his courtroom, however, does not change this court's exclusive jurisdiction for the discipline of judges and the regulation of the conduct of the judiciary. As stated in In re Huckaby, 95-0041 (La.5/22/95), 656 So.2d 292:
[R]emoval of a duly elected member of the judiciary is a serious undertaking which should only be borne with the utmost care so as not to unduly disrupt the public's choice for service in the judiciary. However, this state's constitution vests this court with the duty to preserve the integrity of the bench for the benefit of that same public by ensuring that all who don the black robe and serve as ministers of justice do not engage in public conduct which brings the judicial office into disrepute.
It clearly falls within the purview of this court's jurisdiction to discipline judges for misconduct in violation La. Const. art. V, § 25(C) and the Judicial Code of Conduct. We decline to find that a judge is not subject to discipline for conduct in violation of these well established precepts even if his constituency condones such behavior.
Judge Doggett next argues that this court has never removed a judge for decisional delays due to medical disability, nor has a Louisiana judge been removed from office for issuing search warrants where no harm was proved. Although Judge Doggett acknowledges that his conduct during the course of 2002 falls within the purview of "persistent public conduct prejudicial to the administration of justice that brings the judicial office into disrepute," he urges that, in considering discipline, this court should take into account what did not occur in this matter. Namely, Judge Doggett asserts that this case does not involve fraud, abuse of authority, inability to manage administrative duties, misleading the Judiciary Commission, or engaging in inappropriate political activities. Judge Doggett further urges that discipline for delays in rendering decisions impose sanctions from public censure to 60-day suspension. We disagree with Judge Doggett that the only harm caused by his impairment was the delay in five cases, and find that this argument undermines the seriousness of the misconduct in this case.
This court has only disciplined one other judge for conduct directly arising out of an alcohol problem. In 1987, this court suspended a city court judge for six months without salary for, among other things, striking a law enforcement officer at a public festival and using profane language toward the officer and others. In re Soileau, 502 So.2d 1083 (La.1987). This incident and an earlier, similar incident occurred at times when the judge had been drinking alcoholic beverages for a long *815 period of time without eating. The judge reported his own misconduct and his subsequent nolo contendere pleas to charges of disturbing the peace and simple battery to the Commission.
The instant case is distinguishable from Soileau in several respects. Importantly, there was no evidence that Judge Soileau performed judicial duties while intoxicated. By contrast, court employees, litigants, attorneys, and even a simple visitor to the courtroom had the opportunity to view Judge Doggett presiding while intoxicated. Undoubtedly, the harm to the integrity of the judiciary system is infinitely greater where the "public" conduct occurs in the courtroom and in connection with judicial duties. Therefore, we believe that Judge Doggett's persistent intoxication while performing judicial duties warrants more than the six-month suspension imposed in Judge Soileau's case.
Other jurisdictions have likewise imposed discipline in cases involving alcohol abuse.[9] In In the Matter of Aldrich, 58 N.Y.2d 279, 460 N.Y.S.2d 915, 447 N.E.2d 1276 (1983), a family court judge was removed from office based on two charges of misconduct during sessions of court which the judge presided while intoxicated. On the first occasion, the judge, while presiding over a juvenile proceeding while intoxicated, used profane and menacing language, and threatened a juvenile with scissors. At a second proceeding conducted at a psychiatric hospital, the judge threatened a security guard with a hunting knife, was so intoxicated that he was incapable of presiding, conducted himself in a bizarre manner, and had slurred and incoherent speech. The proceeding had to be adjourned due to the judge's intoxication. In removing the judge, the Aldrich court noted that public confidence was "irretrievably lost."
Although not abusive to litigants, Judge Doggett's persistent intoxication while performing judicial duties constituted a gross violation of the Code of Judicial Conduct and La. Const. art. V, § 25(C). While we recognize that Judge Doggett suffers from a disease, alcoholism is not a defense, but a mitigating factor in disciplinary proceedings. In re Soileau, 502 So.2d at 1090. Judge Doggett is not being sanctioned for being an alcoholic; he is being sanctioned for his inappropriate behavior on the bench. Moreover, a judge is subject to a more stringent standard than an attorney. As we stated in In re Haggerty, 257 La. 1, 241 So.2d 469, 478 (1970):
The office of judge is one in which the general public has a deep and vital interest, and, because that is true, the official conduct of judges, as well as their private *816 conduct, is closely observed. When a judge, either in his official capacity or as a private citizen, is guilty of such conduct as to cause others to question his character and morals, the people not only lose respect for him as a man but lose respect for the court over which he presides as well. This court has clearly articulated that one who holds a judicial office must adhere to the highest standards of personal conduct.
While this court recognizes that Judge Doggett's attempts to achieve and maintain sobriety are mitigating factors in this case, these factors do not excuse or outweigh the number of times which he performed judicial duties while intoxicated. By Judge Doggett's own admission, this case does not involve isolated incidents of misconduct; rather, the number of times which Judge Doggett presided both in court and in chambers while intoxicated was likely greater than the witnesses who testified at the hearing on the Formal Charge realized. Thus, even though the abusive behavior towards litigants is absent in Judge Doggett's case, this record reveals more persistent violations than Judge Aldrich's two isolated incidents of misconduct.
As stated earlier, Judge Doggett's view that the only harm in this disciplinary proceeding is the delay in five cases seriously minimizes the misconduct in this case. Although delays in five cases is insufficient harm to support removal from the bench, the delays are reflective of Judge Doggett's persistent performance of numerous judicial duties while intoxicated. Moreover, the issuance of search warrants while intoxicated, regardless of whether the warrants were not improperly executed, derogates from the integrity of the judiciary. The public has a right to a decision by a sober decision-maker. The purpose of the warrants was to ensure a detached and neutral judge reviewed the warrant before executing a search or an arrest. State v. Bastida, 271 So.2d 854, 855 (La.1973) (an informed and deliberate determination of probable cause is to be made by a neutral and detached magistrate). If the judge is so intoxicated when he reviews a warrant for probable cause that he cannot even read the warrant, the harm has occurred.
The most aggravating and determinative factor in this particular case is that Judge Doggett's misconduct occurred repeatedly in his official capacity. A judge's persistent intoxication on the bench and in chambers results in "an irretrievable loss of public confidence in his ability to properly carry out his judicial responsibilities." In the Matter of Aldrich, 460 N.Y.S.2d 915, 447 N.E.2d at 1278. As the Commission noted, regrettably, this court must focus on the position of the judge, not on the individual. Intoxication of a judge while performing judicial duties compromises respect for the judiciary. As this court recently noted in In re: Judge Yvonne L. Hughes, 2004 WL 867701, 03-3408 (La.4/22/04), 874 So.2d 746:
Essential to the [legal] system is the respect citizens have for the judges they have entrusted to issue decrees that impact their lives, their liberties, and their property. When a judge demonstrates a lack of respect for the rule of law, that sacred trust is violated and our entire system of justice is placed at risk. To command respect for the rule of law, a judge must demonstrate respect for the rule of law.
This language applies equally to a judge who repeatedly fails to uphold the integrity of the judicial office. No court would tolerate an attorney or a litigant appearing in court intoxicated, and certainly it is a gross violation for a judge to sit on the bench and perform judicial duties while *817 under the influence of alcohol. This behavior violates the sacred trust placed in judges to make decisions which affect the lives of citizens and places our system of justice at risk. A judge must hold himself to high standards so as to command respect for the office which he holds and the entire judicial system he serves. Although we feel compassion for Judge Doggett's struggle to maintain sobriety, we must, first and foremost, consider the grave implications which this misconduct casts upon the judiciary. It is for these reasons that this court believes that removal is the appropriate discipline where there has been persistent intoxication while performing judicial duties.

CONCLUSION
Upon review of the record, we conclude that removal is warranted in this case. The repeated performance of judicial duties while intoxicated is a gross violation of Canons 1, 2 A, 3 A(2), and 3 A(3) of the Code of Judicial Conduct and a violation of La. Const. art. V, § 25(C), which brings disrepute to the judicial office. In addition, Judge Doggett failed to perform work in a timely manner and issued warrants while intoxicated in violation of Canons 3 A(1) and 3 A(7).

DECREE
Accordingly, it is decreed that respondent, Judge Monty L. Doggett of the 10th Judicial District Court, Parish of Natchitoches, is hereby removed from office; and that his office is hereby declared vacant. Respondent is ordered pursuant to La. Sup.Ct. Rule XXIII, § 26 to refrain from qualifying as a candidate for judicial office for five years and until certified by this court as eligible to become a candidate for judicial office. Further, pursuant to La. Sup.Ct. Rule XXIII, § 22, we cast respondent with costs incurred in the investigation and prosecution of this proceeding in the amount of $5312.65.
REMOVAL FROM JUDICIAL OFFICE ORDERED.
NOTES
[1] In the course of this proceeding, the anonymous complainant identified herself as Mrs. Vera Dyess. Mrs. Dyess is the paternal grandmother of the child who is the subject of the Dyess v. Butler custody case that was allotted to Judge Doggett.
[2] On February 18, 2004, this court granted Judge Doggett's motion to place his medical records under seal. In re: Judge ABC, XX-X-XXXX.
[3] In addition to testifying with regard to the issuance of warrants, Officer Stafford recalled that there were days when juvenile proceedings had to be canceled because of Judge Doggett's impairment. On these occasions, Officer Stafford testified that the court would have to re-issue subpoenas.
[4] According to a letter from Mr. Whitehead to the Judiciary Commission dated September 25, 2002, Mr. Whitehead experienced significant delays in several cases under advisement in Judge Doggett's court. In Warner v. Natchitoches Parish School Bd., briefs were filed and the case was submitted to the court on October 30, 2001, but was not decided until August 6, 2002. In State v. Desnee Bullock, a criminal post-conviction relief application was filed on February 4, 2002 and required the signing of a simple order. After numerous requests and a client letter to the Judiciary Commission, Judge Doggett finally signed an order dated August 28, 2002, setting the application for a hearing on October 4, 2002. The record does not contain evidence whether this case was ever disposed. Russell E. Gallaghan v. Sidney Thornton was submitted to Judge Doggett on July 5, 2002 and had not been decided as of September 25, 2002.
[5] Hypovolemia, also known as intravascular volume depletion, or decreased blood volume, is a medical condition commonly associated with heavy, long-term alcohol abuse.
[6] La.Rev.Stat. 28:53, entitled "Admission by emergency certificate; extension," provides in pertinent part as follows:

A. (1) A mentally ill person or a person suffering from substance abuse may be admitted and detained at a treatment facility for observation, diagnosis, and treatment for a period not to exceed fifteen days under an emergency certificate.
(2) A person suffering from substance abuse may be detained at a treatment facility for one additional period, not to exceed fifteen days, provided that a second emergency certificate is executed. A second certificate may be executed only if and when a physician at the treatment facility and any other physician have examined the detained person within seventy-two hours prior to the termination of the initial fifteen day period and certified in writing on the second certificate that the person remains dangerous to himself or others or gravely disabled, and that his condition is likely to improve during the extended period ...
[7] Canon 1 provides, in pertinent part, "A judge should participate in establishing, maintaining, and enforcing, and shall personally observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved." Canon 2 A provides, "A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." Canon 3 A(2) provides, "A judge shall maintain order and decorum in judicial proceedings." Canon 3 A(3)provides, in pertinent part, "A judge shall be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom the judge deals in an official capacity ..."
[8] Canon 3 A(1) provides, in pertinent part, "A judge shall be faithful to the law and maintain professional competence in it." Canon 3 A(7) provides, "A judge shall dispose of all judicial matters promptly, efficiently, and fairly."
[9] While the range of sanctions runs the gamut from removal to public censure, at least two jurisdictions, including In the Matter of Aldrich, 58 N.Y.2d 279, 460 N.Y.S.2d 915, 447 N.E.2d 1276 (1983), discussed infra, have previously removed a judge for being intoxicated while on the bench. See, In the Matter of Dearman, 277 S.C. 394, 287 S.E.2d 921 (1982) (removed judge suffering from alcoholism pursuant to a disciplinary rule providing that a judge shall be removed for "habitual intemperance"); Kneifl v. Kneifl, 217 Neb. 472, 351 N.W.2d 693 (1984) (judge suspended without pay for three months based on two isolated incidents which involved cursing and threatening police officers while being booked with DWI); In the Matter of Jett, 179 W.Va. 521, 370 S.E.2d 485 (1988) (judge suspended for sixty days without pay for presiding over one DWI hearing while intoxicated); In the Matter of King, 409 Mass. 590, 568 N.E.2d 588 (1991) (public censure warranted for judge who was publicly intoxicated at a retirement party for court officers, who regularly urinated in public view, and drove while intoxicated); In re Cope, 848 So.2d 301 (Fla. 2003) (public reprimand warranted for judge who was publicly intoxicated at an out-of-state judicial conference and who attempted to forcibly enter a woman's hotel room).