942 So.2d 18 (2006)
In re Judge Allen A. KRAKE, Thirty-Fifth Judicial District Court, Parish of Grant, State of Louisiana.
No. 2006-O-1658.
Supreme Court of Louisiana.
October 27, 2006.
Office of Special Counsel, Steven Robert Scheckman, Special Counsel, for Applicant.
Lemoine & Wampler, Gregory N. Wampler, Pineville, for Judge Allen A. Krake.
Nancy E. Rix, New Orleans, Commission Counsel.

*19 ON RECOMMENDATION FOR DISCIPLINE FROM THE JUDICIARY COMMISSION OF LOUISIANA
CALOGERO, Chief Justice.
This matter comes before the court on recommendation from the Judiciary Commission of Louisiana that Judge Allen A. Krake of the 35th Judicial District Court, Parish of Grant, State of Louisiana, be suspended from office for the remainder of his term with all but six months deferred, placed on probation until the remainder of his term with conditions, and ordered to reimburse the Judiciary Commission the costs incurred in the investigation and prosecution of this judicial discipline case. After reviewing the stipulations of the parties and the record, we find the evidence clear and convincing that Judge Krake violated the Code of Judicial Conduct and Article V, § 25(C) of the Louisiana Constitution of 1974. We find that his public intoxication at judicial and bar conferences, along with his appearance and demeanor on the bench and in chambers, either when he was severely hung over or when he appeared to be hung over, violated Canons 1 and 2(A) of the Code of Judicial Conduct.[1] Therefore, he did not observe the high standards of personal conduct so that the integrity of the judiciary may be preserved, nor did he promote public confidence in the integrity of the judiciary. As a result of his continuing problems stemming from his abuse of alcohol, Judge Krake also failed to maintain decorum in judicial proceedings and the dignity expected of a judge, in violation of Canons 3A(2) and 3A(3).[2] Furthermore, Judge Krake has admitted that he violated the Louisiana Constitution relative to his persistent and public conduct prejudicial to the administration of justice that brought the judicial office into disrepute, his willful misconduct relating to his official duty, and his willful and persistent failure to perform his duty.
Accordingly, we conclude that Judge Krake's persistent and public abuse of alcohol, which manifested itself while performing his judicial duties, warrants that he be suspended from office without salary for the remainder of his term, which expires on December 31, 2008, with all but six months deferred, and that he be placed on probation until the end of his term in conformity with the conditions and terms of probation set forth in this opinion. Should Judge Krake fail in satisfying any one of these conditions, his probation shall be revoked immediately upon the court's receipt of notice thereof and the deferred portion of his suspension shall be made executory.

I. Applicable Law
This court is vested with exclusive original jurisdiction in judicial disciplinary proceedings. La. Const. art. V, § 25(C); In re: Doggett, 04-0319, p. 12 (La.5/25/04), 874 So.2d 805, 812. Consequently, this court has the power to make determinations of fact based on the evidence in the *20 record and is not bound by, nor required to give any weight to, the findings of the Judiciary Commission. In re: King, 03-1412, p. 17, (La.10/21/03), 857 So.2d 432, 445. Article V, § 25(C) of the 1974 Louisiana Constitution provides the substantive grounds for disciplinary action against a judge:
On recommendation of the judiciary commission, the supreme court may censure, suspend with or without salary, remove from office, or retire involuntarily a judge for willful misconduct relating to his official duty, willful and persistent failure to perform his duty, persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute, conduct while in office which would constitute a felony, or conviction of a felony.
Additionally, the Code of Judicial Conduct, adopted by this court under its supervisory authority in 1976, and amended in 1996, supplements the Constitution's substantive grounds for disciplinary action against a judge. See In re: Babineaux, 346 So.2d 676, 678 (La.1977). The Code of Judicial Conduct is binding on all judges, and violations of the Canons contained therein may, without more, serve as a basis for the disciplinary action provided for by La. Const. art. V, § 25(C). King, p. 18, 857 So.2d at 445; In re: Hunter, 02-1975 (La.8/19/02), 823 So.2d 325, 328. The charge or charges against a judge must be proved by clear and convincing evidence before this court can impose discipline. King, p. 18, 857 So.2d at 445; Hunter, p. 3, 823 So.2d at 328.

II. The Complaint
Judge Krake assumed his judicial office in 1994 and was re-elected in 1996 and 2002. On November 16, 2005, this court disqualified Judge Krake from exercising any judicial function during the pendency of this proceeding. In re: Krake, 05-2213 (La.11/16/05), 914 So.2d 1112.
In May 2003, the Office of Special Counsel ("OSC") received a complaint against Judge Krake from a litigant whose child custody case was pending in Judge Krake's court. In his complaint, the litigant stated that Judge Krake was biased and prejudiced against him and that the judge's decisions were being influenced by problems in his personal life related to alcohol abuse. By letters dated June 25, 2003 and September 23, 2003, Judge Krake's counsel responded to the complaint and denied any misconduct relating to the domestic matter. Counsel's correspondence did not address the issue of Judge Krake's use of alcohol, despite the fact that Judge Krake had entered alcohol-dependency treatment centers in April 2003 and again in June 2003. Although the Commission ultimately concluded that Judge Krake was not biased or prejudiced in deciding the domestic case, the members were concerned about the perception that Judge Krake had an alcohol problem which was interfering with his judicial duties. Accordingly, the Commission instructed the OSC to query Judge Krake whether he did, indeed, have a problem with alcohol consumption, and if so, what he was doing to address the problem.
By letters dated December 3, 2003 and December 9, 2003, counsel for Judge Krake acknowledged that Judge Krake is an alcoholic, but specifically denied that the judge's "alcoholism and/or consumption of alcohol ever affected his duties and/or his decisions in those matters addressed in [the litigant's] complaint." In these letters counsel informed the Commission for the first time that Judge Krake had entered the Palmetto Addiction Recovery Center in Rayville, Louisiana for treatment of alcohol addiction on April 30, 2003 and left against medical advice on May 21, *21 2003. On June 28, 2003, Judge Krake entered the inpatient alcohol treatment program at The Right Step at St. Christopher's Halfway House in Baton Rouge, where he remained until August 30, 2003. Counsel reported that Judge Krake underwent intensive outpatient treatment for approximately one month after he was discharged from The Right Step.
The Commission authorized an investigation in February 2004 to determine if Judge Krake's problem with alcohol was affecting his performance of his judicial duties, and whether he actually performed judicial duties while under the influence of alcohol. Counsel for the Commission gave Judge Krake notice of the investigation, and in response thereto, by letter dated February 23, 2004, counsel for Judge Krake reiterated that Judge Krake is an alcoholic but strongly denied that the judge's consumption of alcohol had affected his judicial duties or decisions in the domestic case, or in any matter before his court. Counsel conceded that Judge Krake had not remained sober at all times since his discharge from The Right Step, but emphasized that the judge "remains committed to his recovery and is engaged in a daily program to insure long-term sobriety." Counsel also disclosed that Judge Krake was attending meetings of Alcoholics Anonymous in the Alexandria area, though not on "a fixed schedule" and without documenting his attendance.

III. The Formal Charge
After investigating the matter, the Commission on November 10, 2005, filed a Formal Charge against Judge Krake in No. 0255, alleging that he violated Canons 1, 2 A, 3, 3 A(1), 3 A(2), 3 A(3), and 3 A(7) of the Code of Judicial Conduct.[3] The Commission further alleged that Judge Krake engaged in willful misconduct relating to his official duty, engaged in willful and persistent failure to perform his duty, and engaged in persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute, all in violation of La. Const. art. V, § 25(C). Finally, the Commission alleged that Judge Krake suffers from a disability that seriously interferes with the performance of his duties and that is or is likely to become permanent, within the meaning of La. Const. art. V, § 25(C), justifying his involuntary retirement.
The Commission also specifically alleged as follows: A. Judge Krake is an admitted alcoholic and has failed to maintain sobriety to such a degree that he has, on several different occasions, been significantly impaired while performing judicial duties, including on the bench and in chambers. B. Judge Krake has appeared in public in a state of obvious intoxication on more than one occasion, both in Grant Parish and at bar and judicial conferences. C. Judge Krake has failed to maintain sobriety to such a degree that others have become concerned about or doubtful of his ability to competently perform his judicial duties, including on the bench and in chambers, causing attorneys to privately resolve or settle their clients' cases to avoid having him decide the case while impaired. D. Judge Krake has either failed to obtain appropriate treatment for his alcoholism or the treatment which he has obtained has been, ultimately, ineffective in helping him to remain sober. E. Judge Krake has been stopped, on more than one occasion, by Grant Parish sheriff's *22 deputies on suspicion of driving while intoxicated and was subsequently driven home by the deputy who pulled him over.

IV. Proceedings Before the Commission
On April 19, 2006, Judge Krake and the OSC jointly filed a "Statement of Stipulated Uncontested Material Facts, Stipulated Conclusions of Law, and Stipulated Recommendation of Discipline." In connection with the joint stipulations, the parties agreed to the introduction of Judge Krake's records from three substance abuse treatment facilities and two lawyers assistance programs. The parties also stipulated to the introduction of sworn statements taken by the OSC in 2004 and 2005. The Commission conducted a hearing on the Formal Charge on June 16, 2006.
The only witness to testify at the hearing was Judge Krake. He initially apologized to the Commissioners for causing them to have to address his case. Judge Krake told the Commission that his being hung over on the judicial bench, which he admitted, was wrong.[4] He said he knew the people of his judicial district did not vote him into office thinking he would preside while hung over from alcohol or while thinking about when he could take his next drink. Judge Krake told the Commission that he realized he would always be an alcoholic and he would always want to drink, but he knows that if he takes another drink he will be a "dead man," all due to the negative effects alcohol has already had on his body. When asked whether he had a support system and how he could maintain his sobriety if he would be returned to his position as a judge, a job which Judge Krake admitted was a stressor for him, he stated that he would have the support of numerous fellow AA members in the area. Nonetheless, Judge Krake stated that if the stress of his judicial office were too great, he would have to make a choice for sobriety.
In addition to the stipulated facts, the Commission made its own factual findings and legal conclusions following the hearing. The Commission found that the instant case is dissimilar to that of In re: Doggett, 04-0319 (judge removed from office), and In re: Soileau, 502 So.2d 1083 (La.1987) (judge suspended six-months). Those differences, the Commission reasoned, indicated that a recommendation of judicial discipline less severe than removal from office was warranted in this case. The Commissioners accepted the argument, made jointly by Judge Krake, his legal counsel, and the Office of Special Counsel, as follows:
In Judge Krake's case, there is no question his conduct has been inappropriate and violative of the Code of Judicial Conduct. Critically, Judge Krake, according to the evidence and testimony presented, and in contrast to Judge Doggett, did not consume alcohol at the courthouse and was not "drunk on the bench." Instead Judge Krake often suffered from being severely hung over and therefore did not perform his duties as a judge to the best of his abilities. The foregoing sentence, however, is in no way meant as an attempt to try to diminish the seriousness of Judge Krake's misconduct, for it is conceded that his misconduct is, in fact, serious.
The Commission found that the Stipulated Material Facts and Stipulated Conclusions of Law, along with the pleadings, exhibits, and admissions on file in this case, supported the Stipulated Recommendation *23 of Discipline.[5] In recommending discipline, the Commission looked to the factors set forth by this court in In re: Chaisson, 549 So.2d 259 (La.1989),[6] and concluded:
(a) and (b) Judge Krake's misconduct, as stipulated, reflects a pattern of misconduct that persisted over many years;
(c) and (d) Judge Krake's alcoholism created problems for him that occurred primarily outside of his official judicial duties, but he admitted, and the Commission agreed, that his being hung over while presiding over his court docket was wrong. Further, as he tried to achieve sobriety his absences from the bench affected the administration *24 of justice because substitute judges, either ad hoc or pro tempore, had to be appointed and paid to oversee his docket;
(e) Judge Krake has acknowledged the facts, as alleged, and he has admitted that his actions were wrong;
(f) Judge Krake's testimony at the hearing convinced the Commission that he is committed to rehabilitation for alcoholism and that he will strive to modify his conduct in the future, in which case the Commission believes Judge Krake can serve a portion of his term of office;
(g) Judge Krake was elected to the bench in 1994, and so he was not a new judge when the conduct which led to the Formal Charge and the subsequent stipulation occurred;
(h) Judge Krake has never been publicly disciplined or privately admonished for judicial ethical misconduct, but he was placed on interim disqualification status, which is public;
(i) Judge Krake's problem with alcohol has had a serious impact upon the integrity of and the respect for the judiciary. His alcoholism is well known in the legal community as well as the community in general in Grant Parish; and
(j) While Judge Krake did not necessarily exploit his judicial position in order to drink, he showed no respect for his position, the judiciary, or the people whose lives he was impacting daily when he knowingly went to the courthouse and performed his judicial duties when he was suffering the after effects of having ingested excessive amounts of alcohol.
The Commission did not find Judge Krake in bad faith, but rather the victim of a disease. Considering the parties' stipulations, the Commission voted to make a recommendation of public discipline to this court. Accordingly, the Commission found the record demonstrated that Judge Krake's actions, as proven by clear and convincing evidence, were in violation of the Code of Judicial Conduct and the Louisiana Constitution. For that reason, the Commission recommended that Judge Krake be suspended without pay until the end of his current term of office, December 31, 2008, with all but six months deferred, all in conformity with the stipulated conditions and terms of probation set forth in Note 5 above. The Commission recommended that, should Judge Krake fail in satisfying any one of the conditions, his probation shall be revoked upon the court's receipt of notice thereof and the deferred portion of his suspension shall be made executory. The Commission also recommended that Judge Krake be ordered to reimburse and pay to the Commission the amount of $2,800.06 in hard costs.
Following the filing of the Commission's recommendation, Judge Krake and the OSC filed a joint motion to waive briefing and oral argument, to request that the court consider the case based on the three-volume record, and to request that the court impose the recommended sanction. On July 17, 2006, the court denied the motion.

V. The Medical Records
Judge Krake's medical records, from three substance abuse treatment facilities and two lawyers assistance programs, reflect that he entered the Palmetto Addiction Recovery Center Residential Program on April 30, 2003, and was diagnosed, among other things, with alcohol dependency, nicotine dependency, and major depression. Judge Krake's "chief complaint" as reported upon admission was that he was an alcoholic and that he did not "to get to the point where I am taken away from my job."
*25 A psychiatric evaluation, performed on May 2, 2003, stated that Judge Krake reported beginning to drink alcohol at age sixteen and being a heavy drinker since law school, consuming up to a fifth of whiskey a day. During a two-year period, Judge Krake reported, he drank up to a half gallon of whiskey per day. The psychiatrist opined that Judge Krake's "looming health problems including cirrhosis of the liver" would probably kill him within five years if he did not stop drinking. The psychiatrist noted that Judge Krake wanted help, and feared being removed from the bench as the result of his problem with alcohol. In the Report of Psychological Testing conducted on May 6, 2003, it notes:
Lately he has been drinking up to one fifth per day on weekdays and as much as a half gallon on Saturdays. . . . He denies ever being drunk on the bench but admits to being hung over and not at his best on occasion. He reports that he made no mistakes and had no complaints about his work when hung over. [Emphasis added.]
The psychologist's treatment recommendations included "a long term and intensive residential twelve-step program." However, on May 21, 2003, just three weeks after entering Palmetto, Judge Krake left the center against medical advice.
On June 28, 2003, Judge Krake, then thirty-nine years old, was admitted to The Right Step treatment center. He reported to The Right Step's evaluator that he had been drinking a fifth of vodka or bourbon daily for the past two years. The Right Step Discharge Summary reports:

The patient . . . presents with a 21-year history of alcohol dependence that has been extensive, progressive, and severe. . . . The patient meets full DSM-IV criteria for alcohol dependence, including evidence of both tolerance and withdrawal symptoms. The patient has faced numerous and severe consequences as result of his substance use including, family conflict, social problems, emotional unrest, and occupational functioning. . . . [Emphasis added.]
On August 30, 2003, about two months after entering the program, Judge Krake was discharged from the inpatient program at The Right Step. At discharge, the staff recommended that he: (1) enter an intensive outpatient program; (2) abstain from all mood-altering chemicals; (3) attend 90 AA meetings in 90 days; (4) "get an AA home group and do service work for that group"; and (5) obtain an AA sponsor within one month of discharge. At the time of Judge Krake's discharge from the outpatient program, the staff altered the treatment plan, among other ways, by requiring the judge to attend a minimum of five AA meetings per week.
Judge Krake stipulated that, although he completed the intensive outpatient program on September 30, 2003, he did not follow all of the remaining recommendations upon discharge. Specifically, Judge Krake did not abstain from all mood-altering chemicals; did not attend 90 AA meetings in 90 days; did not get an AA home group and do service work for that group; and did not obtain an AA sponsor within one month of discharge. With respect to the recommendation that Judge Krake attend a minimum of five AA meetings per week, Judge Krake and the OSC stipulated that Judge Krake did abide by this recommendation while he remained in Baton Rouge following his discharge from The Right Step; however, upon his return to his home in mid-December of 2003, he ceased following this recommendation.
Nearly two years later, on September 17, 2005, Judge Krake was admitted to *26 COPAC, a facility in Brandon, Mississippi.[7] He was discharged on December 20, 2005 into the Phase III program. The COPAC Clinical Discharge Summary section entitled "Summary and Prognosis at Transfer/Discharge" reveals that in January 2004, within a month of being discharged from The Right Step program, Judge Krake:
. . . relapsed over some emotional stress related to his marriage and job. He had a slip and then with stressors, it became easier and easier to reach for the bottle. He eventually reached the same point of drinking four days a week at home after work. He would go to work hung over in the morning. During a four day week he would drink two thirds to one fifth daily and the same amount on the weekends. [Emphasis added.]
COPAC recommended that Judge Krake abstain from alcohol, attend and complete Phase III, attend and complete Intensive Outpatient Program, and follow all the requirements mandated by the "Louisiana Impaired Attorneys Program." Judge Krake entered Phase III on December 19, 2005. He was discharged and transferred to Phase IV on January 13, 2006. COPAC's Phase III Clinical Summary section entitled "Course of Treatment and Progress" states that "[o]verall patient made slow steady progress and he was able to find gainful employment. He appeared to be sincere as well as handle this level of care with maturity and responsibility."
At that time, COPAC recommended that Judge Krake complete the Intensive Outpatient program, reside in a half-way house, maintain gainful employment, obtain a sponsor, and continue participating in the twelve step programs.
COPAC's Phase IV records reflect that from January 31, 2006, through March 31, 2006, Judge Krake was the subject of regular random urine alcohol and drug screens and he was negative on each occasion in which he has been tested. During this same time period, COPAC's records further indicate that Judge Krake was "compliant" with his weekly treatment planning.
While in Mississippi, Judge Krake signed a five-year contract with the Mississippi Lawyers & Judges Assistance Program (MLJAP) on February 1, 2006. The contract includes required diligent participation in AA, supervision by a monitor and "unannounced, random, and witnessed drug screens (blood and/or urine)." The Director of MLJAP advised in a letter dated April 5, 2006, that Judge Krake had been in a chemical dependency program (COPAC), was tested weekly and randomly for alcohol and drug use, and that arrangements had been made for continued screening after the judge leaves the program.
On his return to Louisiana, Judge Krake signed a five-year recovery agreement with the Louisiana Lawyers Assistance Program (LLAP) on May 2, 2006. The contract includes required diligent participation in AA (including attendance at three AA meetings per week), supervision by a monitor (an Alexandria attorney), and random blood and/or urine alcohol and drug screens.

VI. The Sworn Statements
In addition to the stipulated medical records, the parties stipulated to the introduction of numerous sworn statements taken by the OSC in 2004 and 2005. Excerpts *27 and summaries thereof are included in the stipulated statement of uncontested material facts. More than one witness described Judge Krake's alcoholism as the "worst kept secret in Grant Parish." Several witnesses stated they had seen Judge Krake visibly intoxicated at bench and bar conferences. Lawyers and courthouse employees stated that Judge Krake had often performed his judicial duties while severely hung over or when he appeared to be severely hung over or under the influence of alcohol. Lawyer witnesses commented that, when Judge Krake appears to be hung over or under the influence of alcohol, they will frequently continue cases or take other measures, such as settling cases, to avoid having Judge Krake make judicial decisions in such an impaired condition. One lawyer testified that he knows other attorneys who have refused to accept cases in Grant Parish, a one-judge district, because of the problems they have encountered with Judge Krake. Nearly every witness, however, observed that Judge Krake was otherwise an intelligent and fair-minded judge and that he simply needed help with his alcohol problem.

VII. Additional Stipulations of Fact and Conclusions of Law
Judge Krake made further stipulations of material facts and conclusions of law. He stipulated that attorneys who had cases in Grant Parish had continued matters because they thought he was not in the proper state to hear a case, and one lawyer said under oath that some lawyers avoided cases altogether if venue was in Grant Parish. He also admitted that, as the result of his continuing problems concerning the abuse of alcohol, he has compromised public confidence in his decisions and in the judiciary and, as a result, he violated the Code of Judicial Conduct. Judge Krake admitted that he violated Canons 1, 2 A, 3 A(2), and 3 A(3) of the Code of Judicial Conduct when he went to the courthouse in a state where many people believed him to be hung over, and in some cases still under the influence. According to his stipulation, this belief on the part of the public and bar was evidenced by his shaking hands, red eyes, "rough" look, stumbling, disheveled dress, and other behaviors or characteristics, as described by those persons whose statements were taken.
Judge Krake stipulated that his incidents of drinking in public, although not while on the bench, as well as his appearance and demeanor at court when he appeared to be hung over, evidenced that Judge Krake, in violation of Canons 1 and 2 A, did not observe high standards of personal conduct so that the integrity of the judiciary may be preserved, nor did he promote public confidence in the integrity of the judiciary. Further, Judge Krake stipulated he has failed to maintain the dignity expected of a judge by his hung-over and sometimes disheveled appearance, in violation of Canon 3 A(3).[8]
Judge Krake further admitted that he engaged in persistent and public conduct prejudicial to the administration of justice that brought the judicial office into disrepute, willful misconduct relating to his official duty, and willful and persistent failure to perform his duty, in violation of La. Const. art. V, § 25(C).
The parties stipulated that Judge Krake's conduct rose to the level of sanctionable *28 ethical misconduct warranting a referral to this court by the Commission. The parties stipulated to a recommended sanction, as set forth in Note 5 above.

VIII. Discussion
We agree with Judge Krake and the Commission that his conduct violated Canons 1, 2 A, 3 A(2), and 3 A(3) of the Code of Judicial Conduct, as well as La. Const. art. V, § 25(C). The stipulations of fact and the record evidence support such a finding by clear and convincing proof. Accordingly, we must decide the appropriate discipline to impose. The Commission has recommended the sanction proposed in a stipulation by Judge Krake and the Special Counsel, namely: that he be suspended from office for the remainder of his term, which expires December 31, 2008, with all but six months of that suspension deferred; that he be placed on probation with certain conditions, see Note 5 above; and that he be ordered to reimburse the Commission for costs in the amount of $2,800.06. Should he fail in satisfying any of the stipulated conditions, Judge Krake agreed that his probation shall be revoked upon the court's receipt of the notice thereof. At oral argument on September 7, 2006, Judge Krake's counsel stated that Judge Krake had nearly one year of sobriety. As we have previously held, "the primary purpose of the Code of Judicial Conduct is to protect the public rather than to discipline a judge." In re: Marullo, 96-2222, p. 4 (La.4/8/97), 692 So.2d 1019, 1023. The Commission implicitly found that its recommended sanction, with the stipulated conditions of probation, would sufficiently protect the public should Judge Krake relapse into alcohol abuse from his present sobriety, and the parties have so argued in brief and oral argument before this court.
Logically, the Commission and the parties have focused on previous discipline cases from this court involving the abuse of alcohol in determining a recommended sanction for Judge Krake's misconduct, namely Doggett and Soileau. The parties distinguish the instant case from Doggett, claiming that Judge Krake was not "drunk on the bench" as was Judge Doggett, but that Judge Krake was severely hung over or appeared to be hung over while performing his judicial duties. Accordingly, we will review Doggett and Soileau.
In Doggett, we found that the judge's persistent public intoxication while performing judicial duties, on the bench and in chambers, warranted his removal from judicial office. In Doggett, the judge was elected to office in 1996, and was re-elected in 2002. When first contacted by the OSC in 2002, Judge Doggett readily admitted he was an alcoholic and had been for more than thirty years. He had sought treatment in the late 1970s and again in 1989, and was able to maintain sobriety for approximately eleven years. In 2000, however, he started drinking to relieve pain caused by an undiagnosed medical condition, and his drinking spiraled out of control even after surgery had relieved his pain. Judge Doggett was, sometimes involuntarily, hospitalized or admitted to various treatment programs approximately six times between December 2000 and May 2003. At the time of oral argument before this court in April 2004, Judge Doggett had maintained sobriety for over thirteen months.
We found that Judge Doggett's alcohol abuse had negatively impacted his ability to perform his judicial duties and therefore compromised the public's respect for the judiciary. Numerous witnesses testified that he was a good judge when he was not drinking, but that he had appeared visibly intoxicated on the bench and in chambers, slurring his speech, disoriented and unable to focus, shaky, and walking unsteadily. *29 On one occasion, a bailiff witnessed the judge drinking at the courthouse. Two law enforcement officers testified that the judge had issued arrest warrants when he was drunk. Due to the judge's intoxicated state, court had to be canceled on some days, and his alcoholism resulted in delays in at least five cases. Judge Doggett's secretary testified that she saw him intoxicated on approximately twenty occasions while at the courthouse during workdays. One morning, the judge was so impaired by alcohol that his staff cleared the public from the hallways outside his courtroom so he could be carried out of his office by sheriff's deputies; despite his staff's efforts, the public saw the judge as he was escorted from the courthouse. The incident was the subject of a front-page article in The Natchitoches Times.
In removing Judge Doggett from office, we found that the most aggravating and determinative factor was that his misconduct occurred repeatedly in his official capacity. Doggett, p. 19, 874 So.2d at 816. We reasoned that "[a] judge's persistent intoxication on the bench and in chambers results in `an irretrievable loss of public confidence in his ability to properly carry out his judicial responsibilities.'" Id. (quoting Matter of Aldrich v. State Comm'n on Judicial Conduct, 58 N.Y.2d 279, 460 N.Y.S.2d 915, 447 N.E.2d 1276, 1278 (1983)). We reiterated that this court must focus on the position of a judge, not on the individual, and that intoxication of a judge while performing judicial duties compromises respect for the judiciary. Doggett, p. 19, 874 So.2d at 816. Although this court felt compassion for the judge's struggle to maintain sobriety, we concluded that "we must, first and foremost, consider the grave implications which [persistent public intoxication while performing judicial duties] casts upon the judiciary." Id., p. 20, 874 So.2d at 817.
This court in In re: Whitaker, 463 So.2d 1291, 1303 (La.1985), set forth guidelines for determining which types of misconduct warrant removal from judicial office.
The most severe discipline should be reserved for judges who use their office improperly for personal gain; judges who are consistently abusive and insensitive to parties, witnesses, jurors and attorneys; judges who because of laziness or indifference fail to perform their judicial duties to the best of their ability; and judges who engage in felonious criminal conduct.
The conduct recognized in Whitaker, however, is not an exclusive list of the types of conduct for which a judge may be removed from office. See King, 03-1412, p. 20, 857 So.2d at 446. Both La. Const. art. V, § 25 and the Code of Judicial Conduct allow removal for a broader range of offenses than the illustrative list set forth in Whitaker. Id. Consequently, in Doggett, we held that a judge who is persistently and publicly intoxicated while performing his judicial duties does not perform those duties to the best of his ability, and he is therefore subject to removal from judicial office for such misconduct.
In Soileau in 1987, this court suspended a city court judge for six months without salary for, among other things, striking a law enforcement officer at a public festival and reviling the officer and others using obscene and profane language. Soileau, 502 So.2d at 1088. This incident and an earlier, similar incident both occurred at times when the judge had been drinking alcoholic beverages for a long period of time without eating. Soileau, 502 So.2d at 1089. The judge reported his misconduct at the festival to the Commission, as well as his subsequent nolo contendere pleas to charges of disturbing the peace and simple battery, which resulted in fines, a suspended jail sentence, and community service. *30 Id. Although he blamed his misconduct on alcohol, Judge Soileau had sought and obtained appropriate treatment before he was faced with disciplinary proceedings in connection with his misconduct. Id. at 1090.
In distinguishing Doggett from Soileau, we noted that there was no evidence that Judge Soileau had performed his judicial duties while intoxicated. By contrast, in Judge Doggett's case, court employees, litigants, attorneys, and even a simple visitor to the courtroom had the opportunity to view the judge while intoxicated. We observed that "the harm to the integrity of the judiciary system is infinitely greater where the `public' conduct occurs in the courtroom and in connection with judicial duties." Doggett, p. 16, 874 So.2d at 815.
In the instant case, the sworn statements contained in the record, and the excerpts and summaries thereof contained in the stipulated statement of uncontested material facts, establish that Judge Krake was seen intoxicated at bar and judicial conferences and that courthouse employees and attorneys often believed that Judge Krake was severely hung over or looked hung over while on the bench or in chambers. These statements paint a distressing picture of a judge potentially losing the respect of the public as a result of his continuing problems stemming from the abuse of alcohol.
As was Doggett, the instant case is not comparable to Soileau, because Judge Krake's abuse of alcohol manifested itself in public, not only at bar and judicial seminars, but also in the courtroom and in chambers when he was severely hung over or appeared to be hung over. Judge Krake stipulated that attorneys who had cases in Grant Parish had continued matters because they thought he was not in the proper condition to hear a case, and one lawyer said under oath that some lawyers avoided cases altogether if venue was in Grant Parish. Thus, while Judge Krake may not have had any particular decisional delays as did the judge in Doggett, these continuances and settlements resulting from Judge Krake's impaired condition, actual or perceived, certainly affected the attorneys and litigants by either prolonging litigation or possibly ending it prematurely. Furthermore, Grant Parish residents were limited to a certain, if not a determinable, extent in their choices for legal representation, because some attorneys refused to accept cases in that judicial district on account of Judge Krake's reputation for being severely hung over while on the bench or in chambers. However, unlike in Judge Doggett's case, there is no evidence that Judge Krake, while intoxicated, signed warrants or made decisions from the bench.
Nonetheless, Judge Krake's public and persistent abuse of alcohol, especially his being severely hung over or appearing to be hung over while on the bench or in chambers, certainly compromises respect both for him as a man and for the court over which he presides. See In re: Haggerty, 257 La. 1, 241 So.2d 469, 478 (1970). "A judge must hold himself to high standards so as to command respect for the office which he holds and the entire judicial system he serves." Doggett, p. 19, 874 So.2d at 817. We recognize that Judge Krake suffers from alcoholism, and our imposition of a sanction today is not designed to punish him for being an alcoholic, but it is instead intended to sanction him for his inappropriate behavior and to protect the public and to preserve its respect for the judicial system. Our review of the recordin light of the Chaisson factors, as examined by the Judiciary Commission, and in light of the guidelines for removal set forth in Whitaker, as applied more recently in Hunter, King, and *31 Doggettconvinces us that removal from office is not warranted in Judge Krake's case. Though Judge Krake, when he was severely hung over, was certainly not performing his judicial duties to the best of his ability, he was not so impaired in the performance of those duties as was Judge Doggett, who was visibly intoxicated while on the bench and in chambers. Consequently, we agree with the Judiciary Commission that suspension until the end of his term, with all but six months deferred, and stringent conditions of probation constitute an appropriate sanction in Judge Krake's case, and will serve to protect the public and to preserve its respect for the judiciary.[9]

IX. Conclusion
In conclusion, we find that the record establishes by clear and convincing evidence that Judge Krake's misconduct violated the Code of Judicial Conduct, as well as Article V, Section 25(C) of the Louisiana Constitution. We find that his public intoxication at judicial and bar conferences, along with his appearance and demeanor on the bench and in chambers, either when he was severely hung over or when he appeared to be hung over, violated Canons 1 and 2(A) of the Code of Judicial Conduct. Thus, thus he did not observe the high standards of personal conduct so that the integrity of the judiciary may be preserved, nor did he promote public confidence in the integrity of the judiciary. As a result of his continuing problems stemming from his abuse of alcohol, Judge Krake also failed to maintain decorum in judicial proceedings and the dignity expected of a judge, in violation of Canons 3 A(2) and 3 A(3). We also find that Judge Krake violated the Louisiana Constitution relative to his persistent and public conduct prejudicial to the administration of justice that brought the judicial office into disrepute, his willful misconduct relating to his official duty, and his willful and persistent failure to perform his duty. Accordingly, we conclude that Judge Krake's persistent and public abuse of alcohol, which manifested itself while performing his judicial duties, warrants that he be suspended from office without salary for the remainder of his term, which expires on December 31, 2008, with all but six months deferred, and that he be placed on probation until the end of his term in conformity with the conditions and terms of probation set forth in this opinion. Should Judge Krake fail in satisfying any one of these conditions, his probation shall be revoked immediately upon the court's receipt of notice thereof and the deferred portion of his suspension shall be made executory. We further find that Judge Krake must reimburse and pay to the Commission the amount of $2,800.06 incurred in the investigation of his case.

DECREE
Judge Allen A. Krake of the 35th Judicial District Court, Parish of Grant, State of Louisiana, is hereby suspended from judicial office without salary until the remainder of his term, which expires on December 31, 2008, with all but six months of that suspension deferred. Judge Krake is hereby placed on probation for the remainder of his term of office, which expires on December 31, 2008, with the following probationary conditions:

*32 1. Judge Krake shall refrain from drinking any alcohol whatsoever and/or from consuming any other forms of mood altering chemicals, unless prescribed by a physician who is knowledgeable and aware of Judge Krake's chemical dependency issues.
2. Judge Krake shall contract with, and be monitored and supervised by, LLAP. Judge Krake shall follow all the requirements, terms and conditions, as contracted and set forth by LLAP, including but not limited to regular prescribed attendance at AA meetings and/or Lawyer meetings.
3. Judge Krake shall submit to random urine alcohol and drug screens to be administered and supervised by the LLAP.
4. Judge Krake stipulates and agrees that LLAP shall immediately report his failure to comply with the requirements, terms and conditions of LLAP including, but not limited to, any positive urine alcohol and drug screens and his failure to attend the required number of AA or Lawyer meetings, directly to the Judiciary Commission and its Office of Special Counsel. Judge Krake further stipulates and agrees that LLAP shall submit monthly reports concerning his progress to the Judiciary Commission and its Office of Special Counsel.
5. If LLAP submits a report to the Judiciary Commission and its Office of Special Counsel that Judge Krake has failed to comply with the terms and conditions of LLAP including, but not limited to, any positive urine alcohol and drug screens, or his failure to attend the required number of AA or Lawyer meetings, the Judiciary Commission shall, without further notice or further hearings, immediately notify the Louisiana Supreme Court that Judge Krake has breached the terms and conditions of his probation. If the Judiciary Commission notifies the Louisiana Supreme Court that Judge Krake has breached the terms and conditions of his probation, the Louisiana Supreme Court shall order that the remaining period of his deferred suspension shall be made executory.
Furthermore, Judge Krake is hereby ordered to reimburse and pay to the Judiciary Commission $2,800.06 representing the amount of costs incurred in the investigation and prosecution of his case.
JOHNSON, J., dissents and assigns reasons.
JOHNSON, J. dissenting:
Judge Allen A. Krake's misconduct was significant and persistent over a lengthy period of time as can be seen from his admission that he reported for work and performed judicial acts while "hung over." Lawyers and other members of the community were reluctant to come forward with complaints against this judge. Most simply avoided his court. More than one witness testified that Judge Krake's alcoholism was the "worst kept secret in Grant Parish."
Judge Krake admitted to daily heavy consumption of alcohol and driving under the influence. As a result of this daily drinking, he also admitted that he experienced blackouts. The record shows that the judge was stopped once for DUI, but the police officer decided instead of charging him, he would follow the judge home.
Judge Krake's staff, namely his law clerks, secretary, and court reporter all testified that they smelled the alcohol on his breath and witnessed him being "hung *33 over" in the courtroom on a daily basis. They testified that the judge's hands would tremble, his eyes were bloodshot, his skin flushed, and his walk unsteady. They testified that on numerous occasions the judge would come to work with his hair and clothes disheveled and unkempt. One employee estimated that the judge was hung over 25% of the time. Another employee was so concerned with the judge's alcohol problem that he would drive him around.
Because Judge Krake's alcoholism was so well known in the Central Louisiana legal community, many attorneys chose to continue or settle their matters, rather than take a chance in proceeding before an impaired judge. The District Attorney for Grant Parish testified that on at least one occasion he was "fairly sure" Judge Krake was intoxicated during the proceeding. As a result, the attorneys were forced to reschedule the matter.
Judge Krake's persistent and public intoxication while performing his judicial duties at the courthouse, and appearing intoxicated at a judge's conference in Lafayette and at other professional gatherings, brings our entire judicial system into disrepute. His alcohol abuse has negatively impacted his ability to perform his judicial duties, and compromised the public's respect for the judiciary. The majority attempts to distinguish this case from In re Doggett, 04-0319 (La.5/25/04),874 So.2d 805, by suggesting that Judge Krake was merely "hung over." I fail to see this distinction. It is clear from the testimony before the Commission that many lawyers and others have witnessed Judge Krake intoxicated in court and in his chambers. The attempt to characterize his situation as "hung over" rather than "drunk" is a distinction without a difference. For the foregoing reasons, I would suspend respondent from judicial office for the remainder of his term which expires December 31, 2008.
NOTES
[1] Canon 1 provides in pertinent part: "A judge should participate in establishing, maintaining, and enforcing, and shall personally observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved." Canon 2 A states in relevant part, "A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."
[2] Canon 3 A(2) provides: "A judge shall maintain order and decorum in judicial proceedings." Canon 3 A(3) provides: "A judge shall be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom the judge deals in an official capacity."
[3] The pertinent provisions of Canons 1, 2 A, 3 A(2), and 3 A(3) are set forth in Notes 1 and 2, supra. The remaining enumerated Canons provide as follows: Canon 3a judge shall perform the duties of office impartially and diligently; Canon 3 A(1)a judge shall be faithful to the law and maintain professional competence in it; and Canon 3 A(7)a judge shall dispose of all judicial matters promptly, efficiently, and fairly.
[4] In his testimony, Judge Krake admitted he violated both the Code of Judicial Conduct and the Louisiana Constitution as a result of his conduct as described in the Formal Charge.
[5] Judge Krake and the OSC stipulated to the following Recommendation of Discipline:

Judge Krake shall be suspended from judicial office without salary for the remainder of his term of office, which expires on December 31, 2008. All but six months of the suspension shall be fully deferred.
Judge Krake shall be placed on probation for the remainder of his term of office, which expires on December 31, 2008, with the following probationary conditions:
1. Judge Krake shall refrain from drinking any alcohol whatsoever and/or from consuming any other forms of mood altering chemicals, unless prescribed by a physician who is knowledgeable and aware of Judge Krake's chemical dependency issues.
2. Judge Krake shall contract with, and be monitored and supervised by, LLAP [Louisiana Lawyers Assistance Program]. Judge Krake shall follow all the requirements, terms and conditions, as contracted and set forth by LLAP, including but not limited to regular prescribed attendance at AA meetings and/or Lawyer meetings.
3. Judge Krake shall submit to random urine alcohol and drug screens to be administered and supervised by the LLAP.
4. Judge Krake stipulates and agrees that LLAP shall immediately report his failure to comply with the requirements, terms and conditions of LLAP including, but not limited to, any positive urine alcohol and drug screens and his failure to attend the required number of AA or Lawyer meetings, directly to the Judiciary Commission and its Office of Special Counsel. Judge Krake further stipulates and agrees that LLAP shall submit monthly reports concerning his progress to the Judiciary Commission and its Office of Special Counsel.
5. If LLAP submits a report to the Judiciary Commission and its Office of Special Counsel that Judge Krake has failed to comply with the terms and conditions of LLAP including, but not limited to, any positive urine alcohol and drug screens, or his failure to attend the required number of AA or Lawyer meetings, the Judiciary Commission shall, without further notice or further hearings, immediately notify the Louisiana Supreme Court that Judge Krake has breached the terms and conditions of his probation. If the Judiciary Commission notifies the Louisiana Supreme Court that Judge Krake has breached the terms and conditions of his probation, the Louisiana Supreme Court shall order that the remaining period of his deferred suspension shall be made executory.
6. Judge Krake shall pay all of the costs incurred by the Judiciary Commission in the investigation and prosecution of his case.
[6] In Chaisson, 549 So.2d at 266, this court, citing Matter of Deming, 108 Wash.2d 82, 119-20, 736 P.2d 639, 659 (1987), set forth a non-exclusive list of factors a court may consider in imposing discipline on a judge:

(a) whether the misconduct is an isolated instance or evidenced a pattern of conduct; (b) the nature, extent and frequency of occurrence of the acts of misconduct; (c) whether the misconduct occurred in or out of the courtroom; (d) whether the misconduct occurred in the judge's official capacity or in his private life; (e) whether the judge has acknowledged or recognized that the acts occurred; (f) whether the judge has evidenced an effort to change or modify his conduct; (g) the length of service on the bench; (h) whether there have been prior complaints about this judge; (i) the effect the misconduct has upon the integrity of and respect for the judiciary; and (j) the extent to which the judge exploited his position to satisfy his personal desires.
[7] The OSC, in the meantime, had taken sworn statements from court staff and other witnesses in September 2004 and in May 2005.
[8] In light of Judge Krake's admission that he violated Canons 1, 2 A, 3 A(2), and 3 A(3), the parties pretermitted stipulating to whether Judge Krake violated Canon 3 A(7), which provides that a judge shall dispose of all judicial matters promptly, efficiently, and fairly. We find that the record evidence does not support a finding by clear and convincing proof that Judge Krake's conduct violated Canon 3 A(7).
[9] This court has previously placed judges who were the subject of recommendations of judicial discipline on probation; therefore, imposing a period of probation with specified conditions in this case is consistent with prior cases. See In re: Chaffin, 05-0782 (La.6/29/05), 906 So.2d 428; In re: Ellender, 04-2123 (La.12/13/04), 889 So.2d 225; and In re: Landry, 01-0657 (La.6/29/01),789 So.2d 1271.