JOHNSON, Justice,
dissents and assigns reasons.
|,1 respectfully dissent from the Court’s denial of Petitioner’s application for admission to the bar.
The Court has denied Petitioner’s application for admission to the bar, finding that the Petitioner failed to meet his burden of proving that he has “good moral character” to be admitted to the Louisiana State Bar association pursuant to Supreme Court Rule XVII, § 5(D). The Court’s decision is primarily based on two allegations: academic misconduct relating to the remaining one credit hour Petitioner needed in order to obtain his law degree; and, misconduct during his employment as a judicial law clerk with former Judge Allen A. Krake.
According to the Commissioner’s report, Petitioner participated in graduation ceremonies at Mississippi College School of Law (“MCSOL”) in May of 2004, but lacked four credit hours to graduate. By August of 2004, Petitioner had competed three credit hours, and he was allowed to write a research paper to obtain the last credit hour.
Regarding the allegation of academic misconduct, Petitioner admittedly resisted and procrastinated in writing the paper supervised by Professor Shelton Hand When he finally submitted a first draft, Professor Hand found it to be poorly written and unacceptable. After more delay, Petitioner completed the assignment to Professor Hand’s satisfaction, obtained the one credit hour and graduated.
The allegation of misconduct arose from a call Professor Hand subsequently 12received from Jimmy White, a MCSOL graduate, who was then employed as the first assistant district attorney (“ADA”) in Colfax, Louisiana. Mr. White reported to Professor Hand that he had learned from *813 another ADA that petitioner had tried to pay him to write his paper. The ADA in question, Scott Prudhomme, testified that he was asked by petitioner several times for advice on writing a paper, and that petitioner finally said, “Why don’t you just write it for me? I’ll give you $500.” Mr. Prudhomme did not accept the offer, and he acknowledged that petitioner probably did not even have $500, considering he was working as a law clerk. Petitioner testified that he did not recall the conversation with Mr. Prudhomme, but if it did occur, it was said solely in a joking manner.
Professor Hand passed along the information from Mr. White to others at the law school, including Assistant Dean Philip McIntosh, via email. Although Professor Hand never raised concerns about whether Petitioner wrote the paper prior to the call from Mr. White, at his deposition Professor Hand testified that he questioned whether Petitioner wrote the paper, since the final product bore no resemblance to the first draft, or other work Petitioner had done in the past. However, Professor Hand admitted that he did not actually know whether someone else had written the paper.
I agree with the Commissioner’s finding that the record fails to prove that Petitioner’s conversation with Scott Prudhomme was a serious negotiation, and was most likely a conversation in jest. Furthermore, Mr. Prudhomme did not testify that he wrote the paper, and there is no proof, outside of speculation and hearsay, that anyone other than Petitioner wrote the paper. In concluding that Petitioner lacks the honesty, trustworthiness, diligence and reliability required by Section 5(B) of Rule XVII, the majority apparently finds credence in the hearsay and unsupported allegations that Petitioner did not write the paper. In my view, the best evidence on | sthe issue of academic misconduct is the certification letter signed by Dean Phillip McIntosh. As Assistant Dean in charge of academic affairs, it was Dean McIntosh’s job to certify character and fitness, which he did on behalf of Petitioner.
Dean McIntosh testified that he had no specific knowledge of any improper acts by Petitioner. Further, McIntosh was fully aware of the allegations brought to his attention by Professor Hand, but other than this hearsay, he testified that he had no independent knowledge of anything evidencing a lack of character in the manner in which Petitioner competed his education. Dean McIntosh’s recommendations are based on his personal knowledge of Petitioner and the contents of his academic file, not on hearsay and unsupported allegations.
I also find no reliable evidence of Petitioner’s misconduct during his employment with former Judge Krake. Petitioner began working for Judge Allen Krake as law clerk in August 2004. Petitioner was terminated in June 2005, effective July 31, 2005. Judge Krake’s position was that petitioner was terminated for misconduct for claiming that he possessed a law degree when he was hired, and for allegedly forging Judge Krake’s signature on a letter increasing Petitioner’s salary. Petitioner denied the allegations, and asserted that his termination was pretextual and in retaliation for his cooperation with the Judiciary Commission’s investigation against Judge Krake arising out of the Judge’s alcoholism.[1] Petitioner believed that he *814 was terminated because he twice testified under subpoena in the Judiciary Commission proceedings against Judge Krake.[2]
|4I find no reliable proof that Petitioner signed the pay raise letter. Rather, I agree with the Commissioner’s finding that Judge Krake actually signed the letter. The Bar Committee apparently chose not to call Judge Krake to testify about whether his signature appeared on the letter. No other credible evidence was presented to prove that this was not the Judge’s signature. More importantly, the Commissioner noted that it was only after Petitioner cooperated with the Judiciary Commission that the pay raise letter was questioned.
The evidence against Petitioner consists primarily of hearsay and speculation. With no actual proof of the alleged misconduct, I cannot agree with the majority’s decision to deny Petitioner admission to the bar. A review of the record, and lack of credible evidence supporting the allegations, leads me to agree with the Commissioner that the Petitioner’s problems arose not due to actual misconduct, but, rather, out of his actions in reporting Judge Krake to the Judiciary Commission and his willingness to cooperate with the Judiciary Commission. The testimony reflects that some court personnel were covering up for Judge Krake, and that although petitioner fully cooperated, he was very fearful of retaliation. The testimony reflects that the information Petitioner provided was absolutely essential to the investigation and to this Court’s subsequent actions against Judge Krake.[3] Notably, petitioner was fired after his sworn testimony taken by the Judiciary Commission.
For these reasons, I respectfully dissent.
KNOLL, J., dissents.
| ]With all due respect, I dissent and would conditionally admit petitioner.

. In the Spring of 2005, Petitioner placed an anonymous call to the Judiciary Commission to report drunkenness and misconduct on the part of Judge Krake. The Commission identified Petitioner’s number from the Caller ID. Petitioner was instructed to file a complaint, and he reluctantly agreed to cooperate with the Judiciary Commission.

. Petitioner stated that Judge Krake cut off communication with him around the time of the testimony (during the Spring and early Summery of 2005) In addition, he was forced to sign a resignation letter by Judge Krake, who told him he "should have been smart.”

. In November of 2005, this Court formally disqualified Judge Krake from exercising judicial functions on an interim basis. In re: Krake, 05-2213 (La. 11/16/05), 914 So.2d 1112. Subsequently, the Judiciary Commission instituted proceedings against Judge Krake, at which time Petitioner testified as a witness concerning Judge Krake's conduct in the office. These proceedings ultimately resulted in this Court suspending Judge Krake until the end of his term, with all but six months deferred. In re: Krake, 06-1658 (La. 10/27/06), 942 So.2d 18. Judge Krake later failed to comply with the conditions of probation, and this Court ordered that the deferred portion of the suspension be made executory. In re: Krake, 06-1658 (La.2/26/08), 976 So.2d 162.